# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS AT LLOYDS, LONDON, *et al.*, | § § § | No. 371, 2016 |
| Defendants-Below, Appellants, | § § § § | Court Below: Superior Court of the State of Delaware |
| v. | § § | |
| | § § | C.A. No. N14C-12-210 |
| CHEMTURA CORPORATION, | § § | |
| Plaintiff-Below, Appellee. | § § § § § | |

Submitted: February 8, 2017
Decided: March 23, 2017

Before **STRINE**, Chief Justice; **HOLLAND** and **VAUGHN**, Justices.

Upon appeal from the Superior Court. **REVERSED**.

Carmella P. Keener, Esquire, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Thomas J. Quinn, Esquire, Stephen T. Roberts, Esquire (*argued*), Alexander Mueller, Esquire, Mendes & Mount, LLP, New York, New York, for Defendants-Below, Appellants, Certain Underwriters at Lloyds, London, et al.

David J. Baldwin, Esquire, Ryan C. Cicoski, Esquire, Potter Anderson & Corroon LLP, Wilmington, Delaware; Helen K. Michael, Esquire (*argued*), Erica J. Dominitz, Esquire, Virginia R. Duke, Esquire, Kilpatrick Townsend & Stockton LLP, Washington, District of Columbia, for Plaintiff-Below, Appellee Chemtura Corporation.

**STRINE**, Chief Justice:

This is an insurance coverage dispute between a chemical company and a group of insurers over whether the insurers must compensate the company for expenses and fines associated with environmental claims against the company in Ohio and Arkansas. The policies in question were part of a comprehensive insurance program that covered the chemical company's operations around the world. The chemical company and the insurers dueled before the Superior Court over what law applied to their contract law dispute regarding the application of the insurance policy. The Superior Court held that the insurance policy was not, in fact, to be interpreted by a consistent law, but instead that the underlying contract law of the states where the environmental claims arose would govern on a claim-by-claim basis. Thus, in determining whether the insurer owed the insured coverage, a court would not apply a consistent body of contract law, but, instead, would apply the contract law of the state home to the underlying claims on which the insurer was then being sued. This would result in the meaning of key terms in this comprehensive program shifting merely based on the happenstance of which particular facilities incurred liability. In this appeal, we agree with the insurer that the Superior Court erred in its application of the relevant choice-of-law principles, and, instead, apply a consistent choice of law principle.

The Superior Court analyzed the chemical company's and insurers' arguments using the *Restatement (Second) of Choice of Law*'s[1] most significant relationship framework, which Delaware has adopted for analyzing contract choice of law. Although this framework is the correct one for analyzing choice-of-law questions like this one, unlike the Superior Court, we view this dispute as one over the meaning of obligations between parties to a contract setting up a comprehensive, nationwide insurance program. The fundamental question we are presented with is whether, in situations like this, Delaware courts are required to treat insurance contracts that are part of a broad insurance program as legal documents with meaning that varies substantially based on where each claim happens to arise, or, alternatively, whether these contracts should be given a more consistent, predictable meaning in accordance with the expectations of the parties to them at the time they made their bargain.

Because we see this dispute as one fundamentally about the meaning of a contract that composed part of a comprehensive, nationwide insurance program, we reject the Superior Court's analysis of the site-of-the-risk presumption. Instead, we consider the contacts forming the most significant relationship, and we do so with three material framing points in mind. First, this dispute is about contract interpretation, not, as the Superior Court characterized it, as an environmental

---

[1] RESTATEMENT (SECOND) OF CONFLICT OF LAWS (1971). This opinion will refer to it as the *Second Restatement* throughout.

2

dispute. Second, we examine the whole contract, rather than just the two remaining claims, to determine its subject matter. Finally, we do not discount the historical contacts relevant at the times the overall insurance coverage was put in place. Because New York was the principal place of business for the chemical company's predecessors at the beginning of the coverage, and there were a number of contacts with New York over time after the beginning of the coverage, the most significant relationship among the parties for these contracts is New York. Thus, New York law should be applied to resolve this contract dispute.

Giving greater weight to the New York contacts is the best way to vindicate the justified expectations of the parties to the contract and avoids a result that none would have anticipated. This result not only gives effect to the *Second Restatement*'s policies for contracts generally, but also fulfills the need for comprehensive insurance programs to have a single interpretive approach utilizing a single body of law unless the parties to the scheme choose otherwise. Precisely because this is an insurance scheme covering diverse nationwide risks, the relationship of the parties cannot center in a rotating and ever-changing way on where the insurer happens to be sued currently, resulting in the policy being read in fundamentally different ways in different cases, based on the happenstance of where, across a broad variety of possible locations and jurisdictions, potential liability results in litigation. Such rotating uncertainty would not be limited to

3

litigation over environmental claims, rather, given the broad scope of this insurance program, it could draw the insurers into great uncertainty in all manner of tort disputes.

Instead, the proper inquiry under the *Second Restatement* should be to make a reasoned determination of what state has the most significant interest in applying its law to the interpretation of the insurance scheme and its terms as a whole in a consistent and durable manner that the parties can rely on. Although the facts of a particular case might lead to a different outcome, here the significance of the parties' contacts with New York, in particular as the headquarters of the insured at the outset of the insurance program, lead us to determine that New York law should apply.

## I.[2]

### A. *Uniroyal's Operations*

A chemical company—doing business from at least the early 1940s as the United States Rubber Company,[3] then as variants on the Uniroyal name[4] until it was purchased by Chemtura Corporation in 2005[5]—purchased a complex set of insurance policies from Lloyd's Underwriters, a variety of other insurers active in

---

[2] The relevant facts are taken from the Superior Court's decision and record provided by the parties. There is no factual dispute as this matter involves settled history and the results of the underlying claims litigation.

[3] App. to Appellants' Opening Br. at A262 (Aff. Of Erica J. Dominitiz in Support of Chemtura's Motion to Determine Applicable Law Regarding Allocation, Ex. 7) [hereinafter *Dominitiz Aff.*].

[4] For simplicity, this opinion refers to the various historical entities as Uniroyal.

[5] *See* Appellee Chemtura Corporation's Answering Br. at 8.

the London insurance market, and the Home Insurance Company, which covered personal injury liability and property damage liability for its global operations beginning in the early 1950s. This opinion refers to the insurers and underwriters together as Lloyd's, unless a distinction is relevant. Although initially a rubber company, Uniroyal expanded its focus and became involved in producing a variety of chemicals, including asbestos and Agent Orange,[6] along with many lesser-known chemicals.[7] The expansive nature of Uniroyal's operations insured by this program is illustrated by the fact that earlier in this litigation Uniroyal and Lloyd's settled disputes related to claims coming from environmental liability at thirty-three sites across fifteen states, including New York, and two Canadian provinces.[8] Indeed, in the late 1960s Uniroyal promoted itself as having close to eighty plants and a presence in over one hundred countries.[9]

---

[6] App. to Appellants' Opening Br. at A393 (Tr. Of June 19, 2015 trial court hearing).

[7] *Id.* at A1208 (Aff. of Stephen T. Roberts in Support of Defendants London Market Insurers' Br. in Opposition to Chemtura's Motion to Determine Applicable Law Regarding Allocation Ex. 25) (A copy of Uniroyal News describes the change in name from U.S. Rubber to Uniroyal in part because "[w]e have evolved also into a major chemical, fibre, textile and plastics producer.") [hereinafter *Roberts Br. in Opposition Aff.*].

[8] App. to Appellants' Opening Br. at A543 (Aff. Of Stephen T. Roberts in Support of Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies' Cross-Motion for Choice of Law Determination, dated Nov. 23, 2015) [hereinafter *Roberts Cross-Motion Aff.*].

[9] *Id.* at A1208 (Roberts Br. in Opposition Aff., Ex. 25).

At the outset of this insurance program, United States Rubber Company was the named insured and New York was its principal place of business.[10] After United States Rubber Company changed its name to Uniroyal, it maintained a New York address until November 7, 1972.[11] The record suggests Uniroyal maintained a manufacturing presence in New York as well. Even after its headquarters moved to Connecticut,[12] Uniroyal maintained offices in New York until 1986.[13] The main broker arranging policies making up the program was a New York-based insurance broker, Marsh & McLennan, although Canadian and Connecticut-based affiliates were also involved for certain policies.[14] Other elements of the insurance program were provided by the Home Insurance Company, an insurance provider based in New York until 1973.[15] Generally, Home provided the first layer of coverage under this program and Lloyd's provided backup coverage.[16] The policies included a Service of Suit Clause that required Lloyd's to "submit to the jurisdiction of any Court of competent jurisdiction within the United States and . . .

---

[10] App. to Appellants' Opening Br. at A499 (Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies' Opening Br. in Support of Cross-Motion for Choice of Law Determination, dated Nov. 23, 2015).

[11] *Id.*

[12] *Id.* at A531 (Roberts Cross-Motion Aff.).

[13] *Id.* at A503 (Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies' Opening Br. in Support of Cross-Motion for Choice of Law Determination, dated November 23, 2015).

[14] *Id.* at A531–33 (Roberts Cross-Motion Aff.).

[15] *Id.* at A533–35.

[16] *See Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368, 1371, 1393–94 (E.D.N.Y. 1988). Thus, Lloyd's functioned as an excess insurer, "an insurer whose coverage of a given loss is activated only after the magnitude of the loss exceeds the limits of applicable 'primary' insurance." COUCH ON INSURANCE 3D §1:4 (2009).

comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court."[17]  For all the policies in question, the appointed agent for Service of Suit was at a New York address.[18]

## *B. Environmental Liability*

Over time, the environment around many facilities producing and using Uniroyal's chemicals was damaged.  Beginning in the 1980s after the enactment of the Comprehensive Environmental Response, Compensation and Liability Act of 1980—commonly known as CERCLA—Uniroyal was found partially responsible for environmental contamination at a number of sites across the United States and Mexico and also incurred liabilities related to the cleanup of those sites in addition to facing a variety of personal toxic tort suits.[19]

As one might expect of a chemical company's insurance program, one of the key risks for which Uniroyal required insurance was coverage for liability from environmental claims and personal injury claims.  So, Chemtura, as Uniroyal's successor, engaged in lengthy litigation with Lloyd's to determine its obligations to pay Chemtura for those liabilities.  This is at least the fifth in a series of lawsuits

---

[17] App. to Appellants' Opening Br. at A17 (Dominitiz Aff., Ex. 7).
[18] *Id*. at A531 (Roberts Cross-Motion Aff.).
[19] *Id*. at A1167 (Ex. 22) (describing Chemtura's environmental liabilities derived from Uniroyal as disclosed in its third quarter 2015 10-Q filing).

7

concerning the insurance policies.[20] After a settlement covering thirty-three sites in fifteen states and two Canadian provinces, Chemtura is seeking coverage for losses related to a site in Arkansas and a site in Ohio, specifically a judgment that Lloyd's "breached their contracts by refusing to cover past and future defense costs and damages."[21]

The Arkansas site was an industrial zone where other companies manufactured herbicides. Uniroyal purchased those herbicides and, in the late 1970s, Uniroyal also acted as a supplier to one of the manufacturers to ensure the continued supply of the product. The claims at the Arkansas site resulted from the U.S. EPA's cleanup of the site and its efforts to recoup costs from parties involved in supplying materials at the site, including Uniroyal.[22] The U.S. EPA has stated that cleanup at the Arkansas site is complete.[23]

The Ohio site was the location of a chemical plant where Uniroyal initially disposed of waste products and later operated the plant itself.[24] The claims at the Ohio site resulted from litigation by the Ohio EPA to determine who would be

---

[20] Corrected Appellant's Opening Br. at 8.

[21] 2016 WL 3884018, at *1.

[22] App. to Appellee Chemtura Corporation's Answering Br. at B11 (Plaintiff Chemtura Corporation's Opening Br. in Support of Its Motion to Determine Applicable Law Regarding Allocation, dated Dec. 23, 2014).

[23] App. to Appellants' Opening Br. at A568 (Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies' Opening Br. in Support of Cross-Motion for Choice of Law Determination, dated Nov. 23, 2015).

[24] Uniroyal Chemical operated the site from 1949-79. App. to Appellee Chemtura Corporation's Answering Br. at B12 (Plaintiff Chemtura Corporation's Opening Br. in Support of Its Motion to Determine Applicable Law Regarding Allocation, dated Dec. 23, 2014)

8

responsible for paying for cleanup.[25]  The Ohio EPA incurred costs already and may incur more, estimated at $3 million by Chemtura, in the future.[26]  The precise amount is uncertain, though, because no cleanup activity is happening at the site.[27]

## C. The Superior Court Litigation

Although extensive litigation from 1984 to 2005 resolved many of the environmental claims for which Chemtura sought compensation from Lloyd's, claims related to the Arkansas and Ohio sites remained.  To resolve these remaining claims, Chemtura filed a suit in Superior Court seeking a declaratory judgment that Lloyd's must reimburse Chemtura for the costs associated with the Arkansas and Ohio sites.  Their dispute hinges on which, if any, of the relevant insurance contracts provide coverage for these costs, and, specifically, on what approach to allocation applies.  If the all sums approach applies,[28] "each insurer is liable for the entire risk, within policy limits."[29]  If the pro-rata approach applies, "each insurer is liable only for its proportionate share of the risk."[30]

---

[25] *Id*. at B13.

[26] *Id*.

[27] App. to Appellants' Opening Br. at A569 (Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies' Opening Br. in Support of Cross-Motion for Choice of Law Determination, dated Nov. 23, 2015).

[28] Lloyd's and Chemtura do not dispute this is the approach used by Ohio law.  *See* App. to Appellants' Opening Br. at A2035 (Tr. Of Feb. 22, 2016 trial court hearing).  The Superior Court found that Arkansas also uses the all sums approach, which Chemtura disputes, but that is an issue that we do not reach.

[29] *Chemtura Corp. v. Certain Underwriters at Lloyd's, et al.*, 2016 WL 3884018, at *2 (Del. Super. Apr. 27, 2016)

[30] *Id*.  The parties do not dispute that New York uses the pro-rata approach.

Chemtura and Lloyd's filed cross motions for the Superior Court to make a choice-of-law determination. Chemtura asked the Superior Court to apply the law of each site, i.e., Arkansas law to claims related to the Arkansas site and Ohio law to claims from the Ohio site. Lloyd's sought New York law to be applied to the disputes.

On April 27, 2016, the Superior Court issued an opinion determining that the law of the state in which each cleanup site was located should control claims related to that site.[31] Because the Superior Court also found that Arkansas and Ohio used the "all sums" approach to allocation, "each insurer is liable for the entire risk, within policy limits."[32] To reach this conclusion, the Superior Court applied Delaware's long standing choice-of-law rules for contracts, based on the *Second Restatement*'s most significant relationship test.[33] The Superior Court began by invoking the *Second Restatement*'s section on insurance contracts, § 193, which articulates a presumption that the principal location of the insured risk has the most significant relationship to an insurance contract.[34] Thus, that state's law applies unless another state has a more significant relationship.[35] The Superior Court next noted two cases from the mid-1990s where the Superior Court had

---

[31] *Id.*
[32] *Id.* at *2.
[33] *Id.*
[34] *Id.* at *3.
[35] *Id.*

10

relied on § 193 to apply the law of the site of the insured risk even though that resulted in applying different state law to different claims under the same insurance contract.[36] The Superior Court distinguished cases where it had applied one state's law for claims in multiple states by observing that they involved "nationwide bodily injury claims resulting from placement of a product in the stream of commerce. They do not involve environmental contamination and remediation."[37] Similarly, the Superior Court distinguished a set of cases applying one state's law as inapplicable because they involved "an overwhelming corporate nexus sufficient to overcome the Section 193 law of the site presumption,"[38] which did not appear to exist in this case. The Superior Court concluded by observing that "Arkansas and Ohio have a vested interest in having their laws applied to these policies. Lawsuits have been filed and may continue to arise out of the sites' usage and cleanup."[39] In contrast, "New York does not have any *current* contacts."[40] Accordingly, the Superior Court determined that Arkansas and Ohio had the most significant relationship and therefore their law should apply. Lloyd's appealed.

---

[36] *Id.* (analyzing *Burlington Northern Railroad Company v. Allianz Underwriters Insurance Company, et al.*, 1994 WL 637011 (Del. Super. Aug. 25, 1994); *Clark Equipment Company v. Liberty Mutual Insurance Company*, 1994 WL 46325 (Del. Super. Aug. 1, 1994)).

[37] *Id.* at *4.

[38] *Id.*

[39] *Id.* at *5.

[40] *Id.* at *6 (emphasis added).

11

## II.

This Court reviews questions of law, including the Superior Court's grant of summary judgment, *de novo*.[41] Delaware follows the *Second Restatement's*[42] "most significant relationship" analysis when considering choice of law in contract disputes.[43] There are, in essence, three components to this choice-of-law analysis: i) determining if the parties made an effective choice of law through their contract;[44] ii) if not, determining if there is an actual conflict between the laws of the different states each party urges should apply;[45] and iii) if so, analyzing which state has the most significant relationship. Here, the Superior Court correctly observed that the insurance policies did not specify a particular state law.[46] And, although Lloyd's also contends that the Superior Court erred in its analysis of Arkansas law,[47] a conflict exists regardless because neither Lloyd's nor Chemtura contest that Ohio uses an "all sums" allocation rule and New York uses a "pro-

---

[41] *Shook & Fletcher Asbestos Settlement Trust v. Safety Nat. Cas. Corp.*, 909 A.2d 125, 128 (Del. 2006).

[42] RESTATEMENT (SECOND), *supra* note 1.

[43] *Deuley v. DynCorp Intern., Inc.*, 8 A.3d 1156, 1160 (Del. 2010); *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160, 1166 (Del. 1978).

[44] RESTATEMENT (SECOND), *supra* note 1, at § 186 ("Issues in contract are determined by the law chosen by the parties in accordance with the rule of § 187 and otherwise by the law selected in accordance with the rule of § 188.").

[45] *See Deuley*, 8 A.3d at 1161 (stating that if the case's result would be the same under the differing laws urged by each party, "[a]ccording to conflicts of law principles . . . there is a 'false conflict,' and the Court should avoid the choice-of-law analysis altogether" (quoting *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006))).

[46] 2016 WL 3884018, at *2.

[47] Appellants' Opening Br. at 31–34.

rata" rule.[48]  Thus, the next step is to assess which state has the most significant relationship to the contract and parties to the contract.

### A. The Second Restatement Framework

In general, the *Second Restatement* is structured with three layers of guidance for determining the state with the most significant relationship to the dispute and thus the applicable state law.  First, the *Second Restatement* provides specific presumptions.  If the facts of a case don't fit those specific presumptions, there are broader subject-matter-specific factors to use.  Regardless, courts use the general policy considerations for choice of law articulated in § 6 to guide the overall analysis.[49]

The *Second Restatement* provides a presumption for insurance contracts, that, as a general matter, the law of the state "which the parties understood was to be the principal location of the insured risk"[50] should be applied because that state will typically have the most significant relationship.  For contract disputes more broadly, the *Second Restatement*'s § 188 identifies five factors to use in deciding which state has the most significant relationship:

> (a) the place of contracting,
> (b) the place of negotiation of the contract,
> (c) the place of performance,
> (d) the location of the subject matter of the contract, and

---

[48] 2016 WL 3884018, at *2.
[49] *Id*. at § 6.
[50] *Id*. at § 193.

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.[51]

The § 188 factors and § 193 presumption are meant to be evaluated based on their relative importance in the particular case and in light of the *Second Restatement*'s general considerations found in § 6[52] that "underlie all rules of choice of law and are used in evaluating the significance of a relationship, with respect to the particular issue, to potentially interested states, the transaction and the parties."[53]

## B. Second Restatement *§ 193*

The Superior Court placed great weight on § 193 to find that the law of Ohio would apply to the Ohio site and the law of Arkansas would apply to the Arkansas site. We do not believe § 193's presumption supports the Superior Court's conclusion for two reasons. First, and most important, we are not convinced that § 193, on its own terms, demands the result the Superior Court found. Second, the Comments to § 193 support our conclusion that its presumption does not apply to

---

[51] RESTATEMENT (SECOND), *supra* note 1, at § 188(2).
[52] *Id*. at § 6. These principles are:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Id*.
[53] *Id*. at § 188 cmt. b.

14

policies such as the ones at issue here, which provide broad-based coverage across many jurisdictions for a company's enterprise-wide risks.

Section 193's presumption does not support the conclusion that the most significant relationship relevant for determining choice of law is the one that Lloyd's and Chemtura have with the two remaining sites. Significantly, § 193's language uses the past tense but is prospective. The state with the most significant relationship is "the state which the parties *understood was to be* the principal location of the insured risk."[54] In other words, the presumptive most significant relationship is based on the parties' expectations at an earlier point in time. Section 193 also does not read "were to be the principal locations," plural, but instead focuses on identifying a single state to supply the contract law to govern the interpretation of the contract's terms.

The most sensible earlier point to assess the parties' expectations in the contract context is at the beginning of their relationship. By their own terms, the contracts cover risks across all of Uniroyal's operations, without specificity, so applying the presumption does not lead to the present-focused conclusion that Ohio and Arkansas are the states with the most significant relationship. Rather, when viewed from the beginning of this insurance program, Uniroyal was a New York-based business seeking nationwide coverage, the contracts were obtained through a

---

[54] *Id*. at § 193 (emphasis added).

15

New York broker, and Uniroyal's New York headquarters was listed on the policies. In contrast, the insurance program began almost two decades before Uniroyal began acting as a supplier to the Arkansas site. Thus, even applying § 193's presumption alone would direct the analysis strongly toward New York, and, in no event, does it support a contract choice of law that rotates claim by claim. Rather than the conclusion that Ohio and Arkansas law should apply, instead, § 193 suggests that there would be a single location whose contract law would consistently govern interpretation of the contract as a contract. At best, therefore, § 193's language would identify New York as the singular principal location of the insured risk and thus support a decision that New York's law applies.

Furthermore, § 193 does not rigidly apply to determining choice of law for this sort of complex, multistate insurance program. For one thing, § 193 makes assumptions that do not apply to the program at issue here: that the term of the insurance policy will be "relatively brief," that it is possible to predict "with fair accuracy where the risk will be located," and that the risk is likely something singular and tangible, an "immoveable object" or "particular building," for example.[55] Here, those assumptions don't fairly describe the insurance program.

---

[55] *Id*. § 193 cmt. b.

16

Section 193 acknowledges this possibility, with its Comment B making the point that the importance of the location of the insured risk has "less significance" when "the policy covers a group of risks that are scattered throughout two or more states."[56]  Of course, § 193's Comment F addresses what it terms "multiple risk policies," but it is not especially helpful.  Comment F refers to a hypothetical policy that insures three houses, each in a different state and observes "[p]resumably, the courts would be inclined to treat such a case, at least with respect to most issues, as if it involved three policies."[57]  That Comment, though, doesn't address the situation before this Court.  Rather, it contemplates a situation where a policy has multiple, clearly delineated insured locations.  Here, the insured locations (with a handful of exceptions) are not specified in the policy, there's no list of all of Uniroyal's facilities for example, and Comment F's speculative, slightly indeterminate guidance does not apply.  In any event, if § 193's presumption does not provide a state law to use, § 188's factors are the most appropriate way to determine the appropriate law.

### C. Second Restatement § 188

Because § 193's presumption is, at best, directionally helpful but arguably not conclusive, our analysis returns to § 188's factors.  Here, we use a lens for

---

[56] *Id.*  Contrary to Chemtura's assertion at oral arguments, this part of the Comment is not limited to moveable risks.

[57] *Id.* § 193 cmt. f.

understanding the relevant contacts that differs from the Superior Court's in three material ways. The first important framing issue is that this is a contract dispute among private parties over how their contract allocates liability among themselves. Neither party alleges that outstanding liabilities won't be satisfied. It's just a question of who will pay. The Superior Court repeatedly framed this dispute in other terms, as an "environmental coverage dispute,"[58] as requiring an inquiry into what states "have the most significant relationships to the environmental contamination and remediation,"[59] and as "an environmental dispute."[60] Although those characterizations describe the nature of the underlying liability, they are not the most accurate framing of the issue before this Court and the Superior Court. Chemtura's own complaint illustrates this. It seeks insurance coverage and, "[b]ecause the *contractual breaches* alleged herein have caused Chemtura to suffer substantial injury and damages, Chemtura seeks an award of compensatory and consequential damages, interest, attorneys' fees, and costs."[61] The complaint's first count invokes 10 *Del. C.* § 6503,[62] which relates to contract construction, and the second count is framed as a breach of contract claim.[63] Thus, in analyzing the contacts relevant to determining the most significant relationship, we focus on the

---

[58] 2016 WL 3884018, at *1.

[59] *Id.* at *6.

[60] *Id.*

[61] App. to Appellants' Opening Br. at A339 (First Amended Complaint, dated Jan. 22, 2015) (emphasis added).

[62] *Id.* at A348.

[63] *Id.* at A349.

18

reality that this is a contract dispute and that the important purpose of fulfilling the justified expectations of the parties in contract disputes is best served by providing terms in the contract with a meaning that does not vary based on the happenstance of the locations of a particular claim.

Following from that observation is another, that the subject matter of the contract itself is not as narrow as the Superior Court seemed to understand it. Chemtura and the Superior Court read the contract narrowly to constrain its subject matter for this analysis to the remaining liability at the Arkansas and Ohio sites. Today, claims at those sites might be the only remaining claims on the policies, but the policies were intended to provide expansive non site-specific coverage, throughout the United States in some instances, and "anywhere in the World" in others.[64] Thus, the Superior Court erred when it restricted its lens to only those liabilities that remain. Neither party would have had such a restricted view of the potential risks at the time they agreed to the insurance contracts; if they did, they could have chosen to specify certain risks or locations, as they did in other parts of their insurance contracts.[65]

The final important framing point is the time period in which to look for contacts. The Superior Court gave greatest weight to contacts that exist today. We disagree with that approach. In a contract dispute like this one, where parties seek

---

[64] App. to Appellants' Opening Br. at A6 (Dominitiz Aff., Ex. 1(f)).
[65] *Id*. at A12 (excluding certain specific property from contract exclusions that otherwise apply).

19

a decision about their mutual obligations under the contract, the appropriate time period to consider is the time at which the contract was formed,[66] and the expectations of the parties about the contacts that would arise from the contract at that time. As the Comment to § 188 notes, "the protection of the justified expectations of the parties is of considerable importance in contracts;"[67] and examining the contacts from the perspective of the time when the contract was formed most helps protect those expectations. This approach is also supported by general principles employed in contract interpretation.[68] On this framing, § 188's factors, especially place of contracting, place of negotiation, place of performance, and Uniroyal's principle place of business, all point in the direction of New York.

Taking this framing into account, § 188's factors are meant to be considered in conjunction with § 6.[69] The comment on § 188 observes that § 6's factors "vary somewhat in importance from field to field" and, for contracts, "the protection of the justified expectations of the parties is of considerable importance."[70] That element of the *Second Restatement*'s principles is best served by keeping in mind that we are addressing a comprehensive, nationwide insurance scheme that would

---

[66] *See, e.g.*, *Tyson Foods, Inc. v. Allstate Ins. Co.*, 2011 WL 3926195, at *5 (Del. Super. Aug. 31, 2011) (analyzing contacts at time insurance policies were procured).
[67] RESTATEMENT (SECOND), *supra* note 1, at § 188 cmt. b.
[68] *See, e.g.*, CORBIN ON CONTRACTS § 24.5 (1998) ("When, *at the time of formation*, the parties attach the same meaning to a contract term and each party is aware of the other's intended meaning, or has reason to be so aware, the contract is enforceable in accordance with that meaning." (emphasis added)).
[69] RESTATEMENT (SECOND), *supra* note 1, at § 188.
[70] *Id*. at § 188.

invariably involve underlying claims from multiple states. By focusing on the contractual nature of the dispute, the broad subject matter of the contracts, and the time of contracting as the most relevant for assessing contacts, this Court can best avoid a result that not only would require the meaning of the contract to vary arbitrarily, but also that would be contrary to Uniroyal's and Lloyd's initial expectations.

### D. The Interests of Arkansas and Ohio

By analyzing the relationship through this historical and contract-based lens, the interests of Arkansas and Ohio, to which Chemtura urges we give great weight, might seem slighted. But, we are not convinced that the interests of Arkansas and Ohio are as extensive in this case as the Superior Court determined they were. This is not a case where the outcome will determine if a party will be liable for pollution cleanup or if the state where the pollution occurred will be left on the hook. Rather, this case is about what a contract means. The evidence of those states' interests, credited by the Superior Court in Chemtura's favor, does not provide a strong argument that either state has a material enough interest in this contract dispute to upend the expectations of the parties.

The Superior Court stated that Arkansas and Ohio "have a vested interest in having their laws apply to these policies." [71] But, neither the Superior Court nor

---

[71] 2016 WL 3884018, at *5.

Chemtura explain how those interests extend beyond an interest in ensuring that someone can be held liable for any additional cleanup. Because this dispute is about allocating liability between two parties and because Chemtura has not made an argument before this Court or the Superior Court that it would be unable to shoulder future burdens coming from these two sites, should they materialize, this Court declines to grant material weight to the interests of Arkansas or Ohio.

### E. What Lloyd's Bargained For

At oral arguments, Chemtura pressed the argument that, although the indeterminate number of potential outcomes for Lloyd's under Chemtura's choice-of-law rule seems undesirable, it is no more or less than what Lloyd's bargained for because they could have pushed for a specific contractual choice of law and, in fact, choice of forum and choice of law were issues "on the table" because Lloyd's consented to a Service of Suit clause allowing the insureds to sue anywhere in the United States. We are unconvinced. For one thing, the Service of Suit clause is simply a forum selection clause, as the Superior Court recognized in an earlier stage of this litigation.[72]

For another, Chemtura's argument treats this insurance program as though it started up today, with both parties operating against a background where the

---

[72] *Chemtura Corp. v. Certain Underwriters at Lloyd's*, 2015 WL 5340475 (Del. Super. Aug. 26, 2015); *see also Monsanto Co. v. Aetna Cas. & Sur. Co.*, 1990 WL 9496 (Del Super. Jan. 19, 1990).

*Second Restatement* was the predominant approach and choice-of-law clauses routinely enforced. But, the *Second Restatement* was only published in 1971, almost two decades after this insurance program began. And, importantly for our present purposes, it took years for the *Second Restatement*'s approach to become the dominant approach for contracts choice of law. Delaware was an early adopter, with this Court using it as early as 1978,[73] but according to one prominent choice-of-law scholar who tracks the use of different choice-of-law methodologies, the *Second Restatement*'s contracts framework has slowly gained acceptance, with only twenty five states using it by the mid-1990s.[74] Some commercially important states, including New York, never fully adopted it.[75]

Indeed, the background law the *Second Restatement* replaced would have yielded a rather different result than what the Superior Court reached. Before adoption of the *Second Restatement* approach, the *First Restatement*'s[76] law of the place of contracting (*lex loci contractus*) would have likely been applied. And, applying that approach likely would have led to selecting New York law, as happened in a related case in Connecticut, which still uses the *First Restatement* approach.[77]

---

[73] *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.*, 394 A.2d 1160, 1166 (Del. 1978).
[74] *See* Symeon C. Symeonides, *The Judicial Acceptance of the Second Conflicts Restatement: A Mixed Blessing*, 56 MD. L. REV. 1248, 1260 (1997).
[75] *Id*. at 1256–60.
[76] RESTATEMENT (FIRST) OF CONFLICT OF LAWS (1934).
[77] App. to Appellants' Opening Br. at A833 (Roberts Br. in Opposition Aff., Ex. 9(b)(iii)).

With that background in mind, it is also important to recognize that, although the *Second Restatement* embraces parties' contractual choice of law,[78] earlier approaches did not look favorably on the enforceability of choice-of-law provisions.[79] Although Lloyd's could have perhaps renegotiated the overall terms of the insurance program in the face of the shifting American choice-of-law landscape, that the background was so different at the outset of the program undermines the persuasiveness of Chemtura's argument that their preferred result is the one Lloyd's bargained for.

## III.

Today, this Court adopts the approach used by the Superior Court[80] and the Court of Chancery[81] on many occasions when confronted by similar problems. Because Uniroyal and its successors obtained an overall set of insurance coverage addressing risks across all of its operations, and because New York was the

---

[78] RESTATEMENT (SECOND), *supra* note 1, at § 187.

[79] *See id.* at § 187 cmt. e ("An objection sometimes made in the past was that to give the parties this power of choice [over the law governing a contract] would be tantamount to making legislators of them. It was argued that, since it is for the law to determine the validity of a contract, the parties may have no effective voice in the choice of law governing validity unless there has been an actual delegation to them of legislative power."). Judge Learned Hand noted in 1931 that "[p]eople cannot by agreement substitute the law of another place" and likened trying to do so as akin to pulling oneself up by one's bootstraps. *E. Gerli & Co. v. Cunard S.S. Co.*, 48 F.2d 115, 117 (2d Cir. 1931).

[80] *Shook & Fletcher Asbestos Settlement Trust v. Safety National Casualty Corporation*, 2005 WL 2436193 (Del. Super. Sept. 29, 2005), *aff'd* 909 A.2d 125 (Del. 2006); *Liggett Group Inc., et al. v. Affiliated FM Insurance Company, et al.*, 788 A.2d 13 (Del. Super. 2001); *Hoechst Celanese Corp. v. National Union Fire Insurance Company of Pittsburgh*, 1994 WL 721651 (Del. Super. Mar. 28, 1994).

[81] *Viking Pump, Inc. v. Century Indemnity Company*, 2 A.3d 76 (Del. Ch. 2009).

principal place of business for Uniroyal at the beginning of the coverage and there were a number of contacts with New York over time after the beginning of the coverage, this Court determines that the most significant relationship among the parties for this insurance program and its contracts is New York, and so New York law should be applied to resolve this contract dispute. This is based, in part, on the sensible understanding that a company's headquarters staff is usually heavily involved in managing insurance programs that cover the entire company.

Applying one law to interpret these contracts, based on the contacts among the parties at the outset of the insurance program, advances several important policy goals this Court recognizes in both contracts and choice of law. The *Second Restatement* emphasizes the importance of "the protection of justified expectations" and "certainty, predictability and uniformity of result,"[82] both of which can be best achieved by applying a single state's law. The alternative would result in a court being forced to inconsistently apply the same contract language based on the happenstance of remaining sites with liability and the meaning of certain terms varying only on that happenstance. Indeed, under the approach Chemtura urges, insurers would be subject to a choice-of-law roadtrip any time an insured changed the location of its headquarters or opened a facility in a different state. That would be "a bizarre result whereby later activities . . . could change the

---

[82] RESTATEMENT (SECOND), *supra* note 1, at § 188 cmt. b.

25

parties' bargain with no evidence of any intent to do so."[83] Such a roadtrip wouldn't just involve environmental claims, but because of the breadth of the policies making up this program, would involve all the variation of different states' tort and insurance law.

Insurance programs like this one are intended to work together to provide overall protection to the insured. That result would be frustrated if identical policy language, granting identical coverage, was interpreted in different ways based on the happenstance of the geographic location of a particular incident of environmental damage. Indeed, if a court were to "conduct a different choice of laws analysis for each policy, then there would be a risk of a court inconsistently applying identical policy language within a single integrated insurance scheme."[84] Accepting Chemtura's preferred approach would result in difficult-to-predict results that would be inconsistent for no reason relevant to the expectations of the parties. Thus, this Court finds that New York has the most significant relationship with the parties and subject matter of the dispute and so New York law applies. The Superior Court's decision of April 27, 2016 is therefore reversed and this case is remanded for further proceedings. Jurisdiction is not retained and the time for filing a motion for reargument or rehearing en banc is shortened to five days.[85]

---

[83] *Viking Pump*, 2 A.3d at 90.
[84] *Id*. at 88–89.
[85] Supr. Ct. R. 4; *id*. 18.