COURT OF CHANCERY
OF THE
STATE OF DELAWARE

PATRICIA W. GRIFFIN
MASTER IN CHANCERY

CHANCERY COURTHOUSE
34 The Circle
GEORGETOWN, DELAWARE 19947

Date Submitted: May 17, 2022
Draft Report: August 22, 2022
Final Report: November 21, 2022

John J. Foster, Jr.
32502 Sea Oak Lane
Millsboro, Delaware 19966

Raymond E. Tomasetti, Jr., Esquire
Tomasetti Law, LLC
1100 Coastal Highway, Unit 3
Fenwick Island, Delaware 19940

RE: *In the Matter of The Doris J. Foster Inter Vivos Declaration of Trust*
C.A. No. 2018-0589-PWG

Dear Mr. Foster and Mr. Tomasetti:

Pending before me is a petition for an accounting and related relief regarding a Florida trust. A trust beneficiary alleges that the co-trustees of the trust, who are also beneficiaries under the trust, improperly reduced his distributions from the trust and failed to provide trust accountings. After trial, I determine that the co-trustees did not furnish the required accountings to the beneficiary but that further remedy for an accounting is not needed. I also find that the smaller distributions to the beneficiary were justified, in part, under the trust's terms and due to the setoff of monies owed by the beneficiary to the trust. But, I conclude that the co-trustees did not fully comply with the trust's terms and, as a result, failed to give the beneficiary his full share. I recommend that the Court grant judgment in favor of the beneficiary in part, and against him in part, and impose a constructive trust

upon prior distributions made to the co-trustees under the trust to provide the beneficiary's full share.  This is my final report.[1]

<h2 style="text-align:center">I.    Background[2]</h2>

Doris J. Foster ("Settlor") executed the Doris J. Foster Intervivos Declaration of Trust ("Trust") on March 13, 1989.[3]  The Trust was subsequently amended by the First Amendment of the Doris J. Foster Intervivos Declaration of Trust dated May 23, 1997;[4] completely amended and restated by the Doris J. Foster Intervivos Declaration of Trust dated January 28, 2000 ("Restatement");[5] amended by the Amendment of the Doris J. Foster Intervivos Declaration of Trust dated May 2, 2003 ("Second Amendment");[6] amended by the Amendment of the Doris J. Foster Intervivos Declaration of Trust dated January 6, 2005 ("Third Amendment");[7] amended by the Amendment of the Doris J. Foster Intervivos Declaration of Trust dated October 5, 2005 ("Fourth Amendment");[8] and amended

---

[1] This report makes the same substantive findings and recommendations as my August, 22, 2022 draft report to which no exceptions were filed. *See* Docket Item ("D.I.") 32.

[2] I refer to the transcript of the trial on May 17, 2022 as "Trial Tr." and to Respondent's trial exhibits as "Resp't Ex."

[3] Resp't Ex. 1, at 1.

[4] *Id*., at 31.

[5] *Id*., at 40.

[6] *Id*., at 70.

[7] *Id*., at 77.

[8] *Id*., at 84.

by Amendment to the Doris J. Foster Intervivos Declaration of Trust dated March 22, 2007 ("Fifth Amendment").[9] The Trust is a Florida trust and is governed by Florida law.[10] After Settlor's death (if her spouse does not survive her), the Trust provides that its assets will be distributed among Settlor's children – John J. Foster, Jr. ("John"), Caroline D. Wilt, Patricia S. Foster ("Patricia"), Mark A. Foster ("Mark"), Martha A. Conover ("Martha"), and Mary J. Cannon, subject to specified adjustments to John's and Patricia's shares.[11]

Settlor died on December 2, 2014.[12] Under the terms of Settlor's Last Will & Testament ("Will"), Settlor's estate largely passed to the Trust.[13] Under the Trust's terms, Martha and Mark were appointed successor co-trustees of the Trust upon Settlor's death.[14] Martha and Mark undertook the duties of winding up the

---

[9] *Id.*, at 92.

[10] *Id.*, at 41 (Restatement, §2.2).

[11] *Id.*, at 84-86 (Fourth Amendment, §9.3). I use first names in pursuit of clarity and intend no familiarity or disrespect.

[12] D.I. 1, ¶ 5.

[13] Resp't Ex. 1, at 97-98 (Will, arts. IV, V). Although the memorandum is not a part of the court record, trial testimony indicated that there was a memorandum addressing specific devises of Settlor's personal property. *See* Trial Tr. 80:4-19; Resp't Ex 1, at 97 (Will, art. IV); *id.*, at 45 (Restatement, §7.6).

[14] Resp't Ex. 1, at 93 (Fifth Amendment, §13.2).

Trust and making distributions to themselves and the Settlor's other children.[15]

Martha and Mark wound up the Trust at the end of 2016.[16]

On August 8, 2018, John filed the Petition for Accounting and other Relief ("Petition"), naming Martha and Mark as Respondents.[17] The Petition alleges that John did not receive an equal share of the distributions as required by the Trust and that Martha and Mark failed to provide information about the Trust to him.[18] The Petition seeks an accounting of the Trust and an equal distribution to John either from Trust funds or a surcharge against Martha and Mark.[19]

On August 31, 2018, Martha and Mark filed their Answer, contending that Settlor and her husband, John J. Foster, Sr. ("Father"), advanced considerable funds to John during their lifetime in the form of loans that were assigned to the Trust.[20] Martha and Mark indicated that, when making the Trust's final distribution, they set off the loans payable to the Trust from John's distribution.[21]

---

[15] *See* Resp't Ex. 2.

[16] *See* Resp't Ex. 9; Trial Tr. 69:11-70:11.

[17] D.I. 1.

[18] *Id.*, ¶¶ 6-8.

[19] *Id.*, at 2.

[20] D.I. 4.

[21] *Id.*, ¶¶ 6-7.

The parties then engaged in discovery.[22]  John's attorney withdrew in October 2020.[23]  This matter was scheduled for a hearing on multiple occasions and rescheduled due to COVID and John's repeated continuance requests.[24]  Trial occurred in this matter on May 17, 2022.[25]  I then issued a draft report on August 22, 2022, and no exceptions were filed.

## II.    Analysis

### A. Accountings

Under the terms of the Trust, Martha and Mark were required to provide annual accountings to the beneficiaries after Settlor's death.[26]  Additionally, under Florida law, the trustee of a Florida trust must keep the beneficiaries of a trust "reasonably informed of the trust and its administration,"[27] and "provide a trust

---

[22] *See* D.I. 6; D.I. 10; D.I. 12.

[23] *See* D.I. 16.

[24] *See* D.I. 17; D.I. 18; D.I. 19; D.I. 20; D.I. 24; D.I. 25.

[25] *See* D.I. 30.  On May 6, 2022, John filed a request for a continuance. *See* D.I. 26.  I denied that motion for a continuance on May 9, 2022, finding that adequate grounds did not exist to continue the trial again. *See* D.I. 28.  On May 16, 2022, John filed a letter seeking either reconsideration of my decision to deny the motion for a continuance or making a renewed motion for a continuance. *See* D.I. 29.  At the beginning of trial, I addressed this letter request as a motion for reargument and denied it. *See* Trial Tr. 10:23-13:2.

[26] Resp't Ex. 1, at 54 (Restatement, §13.3).

[27] Fla. Stat. §736.0813.

accounting … to each qualified beneficiary at least annually"[28] in the form of "a reasonably understandable report."[29]

The uncontroverted evidence presented at trial showed that Mark and Martha did not provide annual accountings. John testified that he did not recall receiving any information about the Trust's administration from Settlor's death until the Petition was filed.[30] Martha testified that she did not communicate with John regarding the administration of the Trust.[31] Thus, the evidence indicates that Martha and Mark did not fulfill this duty as trustees.

But, I find a further accounting remedy, as John has requested, is not warranted in this matter. Here, Martha and Mark provided John with the relevant

---

[28] Fla. Stat. §736.0813(d).

[29] The report should detail trust assets and significant transactions affecting trust administration during the reporting period. Fla. Stat. §736.08135.

[30] Trial Tr. 20:9-14; *id.* 28:11-13. John also seemed to take issue with the actions of Settlor and Father, contending that they had given him no information about their estate plans since the mid-1990s. *See id.* 8:18-20; *id.* 18:13-16; *id.* 19:24-20:2; *id.* 80:20-81:8. John's frustration is understandable but provisions of the Trust were revocable while Settlor was alive, so Settlor had no obligation as trustee, during her lifetime, to advise her contingent beneficiaries regarding the status of the Trust. *See* Resp't Ex. 1, at 40 (Restatement, §1.2); *see also* Fla. Stat. §736.0603(1) ("While a trust is revocable, the duties of the trustee are owed exclusively to the settlor."); *Hilgendorf v. Est. of Coleman*, 201 So. 3d 1262, 1264-65 (Fla. Dist. Ct. App. 2016); *Brundage v. Bank of Am.*, 996 So. 2d 877, 882 (Fla. Dist. Ct. App. 2008) ("[D]uring the settlor/beneficiary's lifetime, a trustee owes a fiduciary duty to the settlor/beneficiary and not the remainder beneficiaries, who not only have no vested interest but whose contingent interest may be divested by the settlor prior to her death.").

[31] Trial Tr. 70:12-71:7.

Trust information during discovery.[32]   Because the requested remedy would provide no additional benefit beyond what was obtained through discovery, I recommend that the Court deny the requested relief of an accounting.[33]

*B. Setoffs from John's Share of the Trust*

In the Petition, John alleges that Martha and Mark made unequal distributions to him out of the Trust.[34]  At trial, evidence was presented about two transactions that were set off against John's share of the Trust and led to an unequal distribution among beneficiaries – first, a $211,561.00 loan assigned to the Trust and, second, an adjustment related to an $100,000.00 advancement.   I address each in turn.

1.   The $211,565.00 Loan Assigned to the Trust

---

[32] Trial Tr. 65:19-66:2; *see also* D.I. 6; D.I. 10; D.I. 12.  Although John testified that his accountant was still lacking some information, he did not identify the accountant nor the missing information, and the accountant did not testify. *See* Trial Tr. 92:9-17.   In contrast, Martha and Mark's attorney represented to the Court that those documents were produced during discovery.  *See id.* 89:2-11.  Considering the evidence as a whole, I am persuaded that the trust information was produced in discovery. *See* D.I. 6; D.I. 12.

[33] *See N. River Ins. Co. v. Mine Safety Appliances Co.*, 105 A.3d 369, 385 (Del. 2014) (where a remedy sought would be useless, equity will not award the remedy because "equity will not do a useless thing"); *Hendry v. Hendry*, 2008 WL 484019, at *10 n. 89 (Del. Ch. May 30, 2006) (suggesting that, given the availability and liberal allowance of modern discovery, a further accounting remedy would be unnecessary); *see also Fla. Gaming Corp. of Del. v. Am. Jai-Alai, Inc.*, 673 So.2d 523, 524 (Fla. Dist. Ct. App. 1996) (holding that discovery of financial information in an accounting case was proper).

[34] D.I. 1, ¶ 7.

John executed a note ("Note"), dated November 1, 2006, in which he promised to repay monies loaned to him by Settlor and/or Father, along with interest at 5% per year.[35] It appears that Settlor or Father gave John $3,500.00 per month between November 2006 and April 2008 and $2,600.00 per month from May 2008 until about January 2011 under the Note.[36] John promised to pay the

---

[35] D.I. 4, ¶ 4; Resp't Ex. 3. Unlike the Trust, the Note does not state which state's law governs it. I turn to Delaware's conflict of laws principles. "Delaware follows the Second Restatement's 'most significant relationship' analysis when considering choice of law in contract disputes." *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017). For contracts, the Court will assess five factors in determining which state has the most significant relationship: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract, and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. *See* Restatement (Second) of Conflicts of Laws §188 (1971). Applying these factors, I consider that the Note was executed in Fenwick Island, Delaware, *see* Resp't Ex. 3, and the underlying agreement has largely been performed in Delaware. *See*, *e.g.*, D.I. 4, Ex. A. Therefore, I apply Delaware law related to the Note.

John argues that the Note cannot be enforced against him because it was not notarized and was not signed by Settlor or Father. Tr. 85:22-86:8. Delaware's Statute of Frauds only requires that a writing memorializing a contract be signed by the person against whom enforcement is sought. 6 *Del. C.* §2714(a). Therefore, the Note can be enforced against him. John further asserts that the signature was not his, contending, alternatively, that he was not capable for medical reasons of signing the Note in the fall of 2006, or that he would not have signed the Note without it being notarized. Tr. 93:10-14; *id*. 40:1-8. To the extent that John contends that the signature was forged, John bears the burden of proof. *See Clymer v. DeGirolano*, 2021 WL 2181377, at *4 (Del. Ch. May 27, 2021). He did not present any evidence to show a forgery or that the Note is invalid. Comparing the signature on the Note and John's signature in a recent court filing, I note both signatures contain distinctive "J"s and I find them to be sufficiently similar to conclude that John has not met his burden to show that the Note was a forgery. *Compare* Resp't Ex. 3 *with* D.I. 29; *see also* D.R.E. 901(b)(3) (providing that a writing and signature may be authenticated through a comparison made by the finder of fact).

[36] Resp't Ex. 3; *see also* Trial Tr. 41:20-24.

loan (principal and interest) back in a balloon payment at (1) the death of both Settlor and Father "with the unpaid balance being deducted from the share of [John's] estate under the Will and or Trust of the last of the Lenders [Settlor or Father] to die," or (2) when John returned to gainful employment.[37]  It is undisputed that John received the money, and John produced that he paid Settlor or Father back for the loan.[38]  Settlor assigned the Note to the Trust on June 3, 2010.[39]  When Martha and Mark were administering the Trust, they set off the amount of principal and interest due on the Note against John's beneficiary interest in the Trust.[40]

---

[37] Resp't Ex. 3.

[38] *See* Trial Tr. 40:9-11; *id.* 45:23-24; *id.* 46:12-14.  John contends that the monies he received were not a loan but repayment for monies owed to him by Father and, alternatively, that Settlor wanted the loan changed so that the monies he received were for taking care of her.  First, John claims that Father owed him for using John's academic trust fund for other purposes. *Id.* 23:18-20; *id.* 26:19-24; *id.* 37:8-9.  But, he admitted that he has no documentation to support his claim. *Id.* 29:1-3; *id.* 32:7-11.  And, neither Martha nor Mark knew anything about an academic trust for John. *Id.* 64:15-20; *id.* 75:17-22.  I find John's testimony unpersuasive.  Second, John asserts that, in April or May 2008, Settlor made an oral modification to the loan so that the amounts paid represented payments for services rendered to her for her care. *Id.* 33:9-12; *id.* 41:18-42:2.  I find John's self-serving testimony to be unconvincing and rely on the evidence showing that Settlor assigned the Note (unmodified) to the Trust in 2010 – two years after the modification allegedly occurred. *See* Resp't Ex. 4.; *see also* D.I. 4, Ex. A (March 9, 2011 letter from Raymond E. Tomasetti, Jr. and Settlor ("Tomasetti Letter") regarding "Loans for John J. Foster, Jr.," discussing the Note and the amount due from John under the Note as of January 31, 2011).  I conclude that John has not proven monies paid to him were not under the Note, or that the Note was subsequently modified to eliminate his repayment obligation.

[39] Resp't Ex. 4.

[40] Trial Tr. 59:11-60:8; *id.* 67:16-68:4; Resp't Ex. 2.

I consider whether, under Florida law, Martha and Mark were entitled to set off a beneficiary's debt to the Trust against that beneficiary's share of the Trust. "If the trustee holds a claim against the beneficiary he has a duty to collect it, and to use the beneficiary's interest in the trust as a source of collection."[41]  Therefore, Martha and Mark were entitled to set off the loan debt that John owed to the Trust under the Note against John's share as a Trust beneficiary.  Indeed, the Note shows that deducting the "unpaid balance" of the loan from John's share was explicitly agreed to by the parties.[42]

2. $100,000.00 Advancement

The Trust provides that, at Settlor's death, the remaining Trust assets will be split among Settlor's children, with John receiving a one-sixth share, subject to an adjustment.  The adjustment provision for John's share provides:

> (1)  Adjustment to Share of John J. Foster, Jr.  For purposes of this subsection, the term "adjustment amount" shall refer to (i) the sum of One Hundred Thousand Dollars ($100,000.00), less (ii) aggregate transfers relating thereto from JOHN J. FOSTER, JR. to [Settlor] and/or [Father] as of the date of the survivor of [Settlor or Father], with the difference between (i) and (ii) then being divided by

---

[41] Bogert Trusts & Trustees § 592 (2d ed. 1980).  *See also Cnty. Nat'l Bank & Tr. Co. of Santa Barbara*, 288 P.2d 880 (Cal. App. 1955); *Sec. Tr. Co. v. Boyd*, 32 A.2d 779 (Del. Ch. 1943); *Sheridan v. Riley*, 32 A.2d 93 (N.J. Ch. 1943).  While I found no Florida caselaw addressing this point, this represents the majority view.  "A trustee who has a duty to pay or distribute property to a beneficiary should be able to set off a sum due (1) a debt of the beneficiary to a settlor, [or] (2) a liability of the beneficiary to a trustee in their representative capacity …" Bogert Trust & Trustees § 814 (3d ed. 2020).

[42] Resp't Ex. 3, §3(A)(1).

> two (2). … The adjustment amount shall be subtracted from the share created for JOHN J. FOSTER, JR., and allocated equally among the shares created in Subsections (a) through (f) of this Section entitled "Division Upon Death", including the share created for JOHN J. FOSTER, JR.

("Adjustment Provision").[43] Martha and Mark believed that the Adjustment Provision addressed a loan, or monies provided in advance of Settlor's death, by Settlor to John.[44] Similar to his argument regarding funds paid under the Note, John asserts that the $100,000.00 was not an advancement but compensation for Father's improper use of funds from a separate trust.[45] Unlike the Note, however, there is no written documentation related to this $100,000.00.[46] Considering the evidence as a whole, I find that the $100,000.00 was likely an advancement but, regardless, the Trust provides for adjusting John's share based on that

---

[43] Resp't Ex. 1, at 85 (Fourth Amendment, §9.3(a)(1)).

[44] *See* Resp't Ex. 2; D. I. 4, ¶¶ 4, 7. Martha testified that she believed the reason for the Adjustment Provision was that John had already received the $100,000.00, representing the minimum amount the Settlor/Father wanted all of the children to receive from the Trust, before Settlor's death. Trial Tr. 54:20-55:5; *see also* D.I. 4. Ex. A (Tomasetti Letter discussing that the Trust acknowledges "the $100,000 that [Settlor] had previously given to [John]").

[45] *See* Trial Tr. 25:10-12; *id.* 29:10-31:10; *id.* 38:3-9. John repeatedly acknowledged that he had no documentation of any debts that Father owed him. *See*, *e.g.*, *id.* 33:16-34:1. Further, there was some confusion in John's testimony as to whether Father had paid back the funds he owed him earlier. Trial Tr. 38:8-39:13. Martha and Mark disclaimed knowledge of any academic trust for John or any debts that Father owed John. *See id.* 64:15-20; *id.* 65:12-16; *id.* 75:17-76:1. I do not credit John's testimony because it was self-serving and not corroborated by other evidence. And, the evidence provides no basis to understand the nature or amount of the alleged debt and whether it was enforceable. *See supra* note 38.

[46] *Cf.* Resp't Ex. 3.

$100,000.00.[47] Martha testified that, in determining John's share from the Trust, she and Mark distributed the Trust funds according to the Trust's terms as her "parents wanted [them] to do," and they argue that they complied with the Adjustment Provision in setting off the $100,000.00 advancement against John's beneficiary share so that John's share is equal "in a situation where he got [some of] his before his parents died."[48]

There is an issue, however, with Martha and Mark's interpretation of the Adjustment Provision regarding the calculation of John's adjustment amount.[49] Under Florida law, "the polestar of trust interpretation is the settlor's intent."[50] "If the language in the trust is unambiguous, the settlor's intent as expressed therein controls and the court cannot rely on extrinsic evidence."[51] "To determine the settlor's intent, the court should construe the instrument as a whole, taking into account the general dispositional scheme."[52]

---

[47] *See* Resp't Ex. 1, at 85 (Fourth Amendment, §9.3(a)(1)).

[48] *See* Trial Tr. 66:3-7; *id.* 66:18-24; *id.* 89:12-21; *id.* 90:13-14.

[49] Although John did not bring up this issue specifically, he seeks to have his share of the Trust equalized and Martha and Mark effectively raised it when they testified that they had properly administered the Trust. Trial Tr. 66:3-7; *id.* 90:14-18; *see also* D.I. 1, at 2.

[50] *Vigliani v. Bank of Am., N.A.*, 189 So.3d 214, 219 (Fla. Dist. Ct. App. 2016) (cleaned up).

[51] *Id.* (cleaned up).

[52] *Id.* (cleaned up).

The Adjustment Provision provides that the "adjustment amount" should be subtracted from John's share, divided by six, and one-sixth of the adjustment amount added to each beneficiaries' share, including into John's.[53] The "adjustment amount" is $100,000.00, less any amount that John paid to Settlor or Father during their lifetimes, divided by two.[54] No evidence was presented that John ever transferred any of the $100,000.00 to Settlor or Father during their lifetimes. So, the "adjustment amount" should have been $50,000.00 ($100,000.00 divided by two), and $50,000.00 should have been deducted from John's share, divided into six, and $8,333.33 ($50,000.00 divided by six) should have been added into each beneficiaries' share, including John's. But this was not the process followed by Martha and Mark – they set off the entire $100,000.00 against John's interest in the Trust.[55]

In their administration of the Trust, Martha and Mark included the full $100,000.00 from John and $20,000.00 from Patricia as Trust assets for a total of $3,816,000.00, and a $636,000.00 distribution from the Trust.[56] Applying the

---

[53] *See supra* note 43 and accompanying text.

[54] *Id.*

[55] Resp't Ex. 2.

[56] *Id.* The Trust provides for the same calculation to determine Patricia's adjustment amount for her $20,000.00 as it did for John's $100,000.00. *Compare* Resp't Ex. 1, at 85 (Fourth Amendment, §9.3(a)(1)) *with id.*, at 85-86 (Fourth Amendment, §9.3(c)(1)). $636,000.00 represents a one-sixth share of $3,816,000.00. The additional $219,000.00

Adjustment Provision, they should have included only the adjustment amounts – or $50,000.00 from John and $10,000.00 from Patricia – making the total Trust assets $3,756,000.00, and $626,000.00 a one-sixth share of the Trust assets.[57] And, under the Adjustment Provision, they should have deducted $50,000.00 from John's $626,000.00 share, and added $8,333.33 for his one-sixth share of his adjustment amount and another $1,666.66 for his one-sixth share of Patricia's adjustment amount, or $586,000.00 for John.[58]  Then, as Martha and Mark did, John's $211,561.00 loan memorialized in the Note would be set off from John's share, which results in John being entitled to a distribution of $374,439.00 from the Trust.[59]  John received $324,439.00 from the Trust.[60]  Therefore, John should receive an additional $50,000.00 in distributions from the trustees.

---

that each beneficiary received from Father's trust is not addressed in this Report. *See* Resp't Ex. 2.

[57] Since Martha and Mark included the full $20,000.00 from Patricia in Trust assets, I assume that Patricia did not compensate Settlor/Father for any of the $20,000.00 and her adjustment amount would be $10,000.00 ($20,000.00 divided by 2), and $1,666.66 (1/6th of the adjustment amount) would be added into each beneficiary's share.  However, any change in the distribution related to the incorrect adjustment amount calculated for Patricia's share is not addressed here, since she has filed no claim in this Court regarding her Trust distribution.

[58] I rounded up the total of $585,999.99.

[59] *See supra* notes 35-42 and accompanying text.

[60] Ex. 2; Ex. 6; Ex. 8; Ex. 9.  At trial, Martha and Mark's Counsel indicated that John actually received an additional $300.00. Trial Tr. 68:21-24; *see* Resp't Ex. 6.  I decline to include that $300.00, which represented 1/6 of the cash found, since there is no proof that the cash found was included as a Trust asset for distribution purposes. *See* Resp't Ex. 2.

Under Florida law, as trustees, Martha and Mark are required to "administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries …"[61] They "shall administer the trust as a prudent person would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill, and caution."[62] The Trust provides that trustees shall act in a "fiduciary capacity," and "shall not have the power, either directly or indirectly, to enlarge or shift any of the interests of any beneficiary in the [Trust]."[63]

Martha and Mark, in taking on the role of trustees of the Trust, were required to fulfill the terms of the Trust in a prudent manner – with reasonable care, skill and caution. I find that they misinterpreted the Trust and, in doing so, failed to properly distribute John's share of the Trust funds in violation of the Trust's terms. Their actions do not reflect the "diligence and care which a prudent man ordinarily uses in his own concerns"[64] and represent a breach of their duties as fiduciaries. Under the Trust, they did not have the power to shift John's interests

---

[61] Fla. Stat. §736.0801.

[62] Fla. Stat. §736.0804.

[63] Resp't Ex. 1, at 52 (Restatement, §10.21).

[64] *Thomas v. Carlton*, 143 So. 780, 784 (Fla. 1932) ("trustees are held merely to that diligence and care which a prudent man ordinarily uses in his own concerns").

to other beneficiaries in contravention of the Trust terms. Accordingly, they are liable for restoring John to the correct value of his share as determined by the Trust.[65] Given that the Trust distributions were made and the Trust was wound up by the end of 2016, it is unlikely that undistributed Trust funds remain to compensate John for the $50,000.00 shortfall. If no Trust assets remain, Florida law allows a court to impose a constructive trust over wrongfully disposed of trust property to the extent that the trust property is traceable, or to order other appropriate relief.[66] I recommend that the Court impose a remedy of a constructive trust in the amount of $50,000.00 upon prior Trust distributions Martha and Mark made to themselves to be held for John's benefit.[67]

---

[65] Fla. Stat. §736.1002 (if a trustee commits a breach of trust, they are liable for "[t]he amount required to restore the value of the … trust distributions to what they would have been if the breach had not occurred").

[66] Fla. Stat. §736.1001(2)(i),(j); *see also id*. §736.1018.

[67] If a constructive trust cannot be established from prior Trust distributions to Martha and Mark, the Court shall revisit the remedy and consider other equitable remedies to make John whole. Further, in the Petition, John sought attorneys' fees. *See* D.I. 1, at 2. This request was not renewed at trial and John was no longer represented by counsel. Delaware follows the American Rule, which provides that each party is normally responsible for their own attorneys' fees, whatever the outcome of the litigation, absent express statutory language to the contrary or an equitable doctrine exception, such as the bad faith exception. *See Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017) (citation omitted); *see also ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014). Delaware courts have awarded attorneys' fees for bad faith when "parties have unnecessarily prolonged or delayed litigation, falsified records or knowingly asserted frivolous claims." *Kaung v. Cole Nat. Corp.*, 884 A.2d 500, 506 (Del. 2005) (quoting *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 546 (Del. 1998)) (internal quotation marks omitted). "The bad faith exception is applied in 'extraordinary circumstances' as a tool to deter abusive litigation and to protect the integrity of the

## III.   Conclusion

For the reasons set forth above, I recommend that the Court enter judgment in John J. Foster, Jr.'s favor as to his claim for an equal distribution of the Trust assets and that Martha and Mark be directed to distribute an additional $50,000.00 in Trust funds to John.  If insufficient Trust funds exist, a constructive trust in that amount shall be imposed upon prior distributions Martha and Mark made to themselves from Trust funds.  I recommend that the Court enter judgment in Martha and Mark's favor as to the remainder of John's claims.  This is a Master's Final Report and exceptions may be taken under Court of Chancery Rule 144.

*/s/ Patricia W. Griffin*
Master Patricia W. Griffin

---

judicial process." *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 227 (Del. 2005) (citation omitted).  Even if John has incurred attorneys' fees in this litigation, I find no basis to justify fee shifting in this case and that each party should bear their own fees.