# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| SYCAMORE PARTNERS MANAGEMENT, L.P. (F/K/A SYCAMORE PARTNERS MANAGEMENT, L.L.C.), SYCAMORE PARTNERS, L.P., and SYCAMORE PARTNERS A, L.P., | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C.A. No. N18C-09-211 AML CCLD |
| ENDURANCE AMERICAN INSURANCE COMPANY, CONTINETAL CASUALTY COMPANY, ZURICH AMERICAN INSURANCE COMPANY, XL SPECIALITY INSURANCE COMPANY, STARR INDEMNITY & LIABILITY COMPANY, MARKEL AMERICAN INSURANCE COMPANY, ARGONAUT INSURANCE COMPANY, GREAT AMERICAN COMPANY, IRONSHORE INDEMNITY, INC., and EVEREST NATIONAL INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**Submitted: November 19, 2020**
**Decided: February 26, 2021**

# MEMORANDUM OPINION

## Upon Plaintiffs' Motion for Partial Judgment on the Pleadings:
## GRANTED

David J. Baldwin, Esquire, Peter C. McGivney, Esquire, of BERGER HARRIS LLP, Wilmington, Delaware, John E. Failla, Esquire, Nathan R. Lander, Esquire, Elise A. Yablonski, Esquire, of PROSKAUER ROSE LLP, New York, New York, *Attorneys for Plaintiffs Sycamore Partners Management, L.P., Sycamore Partners, L.P., and Sycamore Partners A, L.P.*

Barry M. Klayman, Esquire, of COZEN O'CONNOR, Wilmington, Delaware, Michael R. Davisson, Esquire, of COZEN O'CONNOR, Los Angeles, California, *Attorneys for Defendant Starr Indemnity & Liability Company.*

Elena C. Norman, Esquire, Michael A. Laukaitis, II, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, Michael F. Perlis, Esquire, of LOCKE LORD LLP, Los Angeles, California, *Attorneys for Defendants Markel American Insurance Company.*

Elena C. Norman, Esquire, Michael A. Laukaitis, II, Esquire, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, Michael P. Duffy, Esquire, Scarlett M. Rajbanshi, Esquire, of PEABODY & ARNOLD LLP, Boston, Massachusetts, *Attorneys for Defendant Argonaut Insurance Company.*

Ian Connor Bifferato, Esquire, of THE BIFFERATO FIRM, P.A., Wilmington, Delaware, James Thurston, Esquire, of WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP, Chicago, Illinois, Daniel E. Tranen, Esquire, of WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP, Edwardsville, Illinois, Elizabeth B. Sandza, Esquire, of WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP, Washington, DC, *Attorneys for Defendant Great American Insurance Company.*

Carmella P. Keener, Esquire, of COOCH AND TAYLOR, P.A., Wilmington, Delaware, Ronald P. Schiller, Esquire, Daniel J. Layden, Esquire, of HANGLEY ARONCHICK SEGAL PUDLIN & SCHILLER, P.C., Philadelphia, Pennsylvania, *Attorneys for Defendant Ironshore Indemnity, Inc.*

**LEGROW, J.**

Three investment funds acquired a company, allegedly raided its high-performing assets, and left the remainder as an overly leveraged shell. During bankruptcy proceedings, the company's bankruptcy estate sued the investment funds and their managers for fraudulent conveyance, breach of fiduciary duty, and related business torts. The investment funds ultimately settled those claims for $120 million.

To recoup some of that settlement and the costs of mounting a defense to the claims, the investment funds turned to their insurers. The insurers, however, refused to pay. As a result, the funds filed this action seeking damages for breach of contract and a declaration that the insurers are obligated to provide coverage. In response, the insurers raise a number of affirmative defenses. Relevant to this decision is the so-called "uninsurability defense." Through that defense, the insurers contend the funds' settlement is uninsurable as a matter of public policy because it represents disgorgement of, or restitution for, ill-gotten gain. The funds move for judgment on the pleadings as to the applicability of the uninsurability defense.

Although this case is a coverage dispute, the pending motion primarily turns on a conflict-of-law analysis. Resolving the funds' instant motion requires the Court to decide which state's "public policy" serves as the reference point for the uninsurability defense: Delaware or New York. The funds assert Delaware law applies and Delaware does not have a public policy against insuring restitution or

disgorgement. The insurers insist New York law applies and New York does have such a public policy.

The conflict of law question before the Court requires it to interpret a provision in the insurance policies that the investment funds contend is a choice of law provision. Under the policies, the parties agreed that the "law most favorable" to the insured would apply to coverage disputes in which the insurers challenged a loss as uninsurable. That "law most favorable" clause unambiguously is a choice of law provision, and the insurers do not meaningfully argue otherwise. Instead, the insurers contend the provision is unenforceable because it frustrates New York's interest in preventing the indemnification of wrongful gains. But the insurers have not met their burden to demonstrate that the choice of law provision should not apply. Accordingly, and because the funds validly have nominated Delaware as the jurisdiction "most favorable" to them, Delaware public policy determines the uninsurability defense's fate.

Delaware law proscribes many acts the taking of which produce relief akin to restitution and disgorgement. But any Delaware public policy against *insuring* conduct for which restitution and disgorgement is appropriate must be expressed by the legislature, not the judiciary. The General Assembly, however, has not enacted a statute proscribing insurance for restitution or disgorgement. The legislature instead has left the issue as one to be negotiated by contracting parties. Had the

insurers wished to avoid exposure to settlements like the one at issue here, they could have drafted the policies in that way. Because they did not, however, their uninsurability defense fails as a matter of Delaware law. Accordingly, and for the reasons discussed below, the funds' motion for judgment on the pleadings as to the uninsurability defense is **GRANTED**.

## BACKGROUND

This case arises from an insurance contract dispute in which Starr Indemnity & Liability Company, Markel American Insurance Company, Argonaut Insurance Company, Great American Insurance Company, and Ironshore Indemnity, Inc., (collectively, the "Insurers"),[1] denied three Delaware-organized private equity firms, Sycamore Partners Management, L.P., Sycamore Partners, L.P., and Sycamore Partners A, L.P. (collectively, "Sycamore"), coverage for expenses incurred in a lawsuit prosecuted by the bankruptcy estate of a retail fashion holding company Sycamore acquired ("Nine West" (f/k/a the "Jones Group")).

After the Insurers denied coverage, Sycamore filed this action seeking a declaration that Sycamore's settlement with Nine West's estate (the "Nine West Settlement") is a "Loss" covered by the subject policies. In their answers, the Insurers asserted several affirmative defenses, including that the Nine West

---

[1] The five other named defendants settled before this decision and have been dismissed with prejudice. *See* Dismissal Stipulation Orders (D.I. 46, 150, 158).

3

Settlement is uninsurable as a matter of public policy (the "Uninsurability Defense"). Sycamore moved for judgment on the pleadings as to the applicability of that defense.

## A. The Policies

Sycamore purchased from the Insurers excess insurance coverage for a "Loss" generated by a "Claim" involving directors' and officers' ("D&O") and errors and omissions ("E&O") liability.[2] The tower of excess insurance follows form to a primary coverage policy and encompasses claims made between December 31, 2016 through June 30, 2018 (the "Policies").[3] The Policies were issued and brokered in New York, where Sycamore is headquartered, and contain scattered references to New York law.

The Policies define "Loss" generously to include "settlements," "judgments," "damages," and various litigation fees. The definition of Loss excludes, however, "amounts which are uninsurable under the law most favorable to . . . insurability."[4] Stated differently, the Policies bar coverage for expenses that are "uninsurable" in a jurisdiction that would be most likely to construe the Loss as insurable.

---

[2] *See generally* Endurance Primary and Insurers' Excess Insurance Policies, Exhibits 1-11 (D.I. 128) (hereinafter, "Policies").

[3] *See generally id.* Exhibits 2-11. Because the Insurers' excess Policies follow form to the primary agreement, the Court cites to the primary agreement when referencing the Policies.

[4] *Id.* § I.O(1); *see id.* § I.O (defining Loss before providing the law most favorable clause).

4

Relatedly, the Policies exclude coverage for unlawful gains. Under the Policies, "any personal profit or remuneration gained by [Sycamore or its managers] to which [they are] not legally entitled" is excluded from coverage.[5] This exclusion, however, is not unlimited. Unlawful gains are excludable only if they truly are "unlawful," *i.e.*, determined to be so in a "final, non-appealable adjudication."[6]

## B. The Challenged Transactions and Nine West Settlement

From 2013 to 2014, Sycamore targeted the Jones Group—a holding company which owned several retail fashion brands—for acquisition and resale.[7] Sycamore engaged in a series of transactions to achieve that end. Sycamore first purchased the Jones Group's stock through a leveraged buyout.[8] Next, Sycamore caused the Jones Group to consolidate—and ultimately merge with—Jones Group affiliates and subsidiaries to centralize their most lucrative assets within a renamed firm: Nine West.[9] Nine West then sold three high-performing assets to Sycamore from which the latter extracted $160 million in dividends.[10] Finally, Sycamore sold those assets on the secondary market for a net profit of $336 million.[11]

---

[5] *Id.* Exclusions, § IV.A(1)(b).
[6] *Id.* § IV.A(1).
[7] Exhibit A, Nine West Chapter 11 Plan at 21-25 (D.I. 134) (hereinafter, "NW Plan").
[8] *Id.* at 22-23.
[9] *Id.* at 23-25 & n.11.
[10] *Id.* at 23-25.
[11] *Id.*

Because the deals primarily were financed with debt, Nine West's post-closing capital structure mostly was comprised of liabilities that went unserviced without the equity in the liquid assets Nine West exchanged.[12] Overly leveraged and facing insolvency, Nine West filed for Chapter 11 bankruptcy protection. In 2018, Nine West's estate sued Sycamore and its management alleging fraudulent transfers, breaches of fiduciary duty, and related business torts arising from the transactions Sycamore directed.[13] Sycamore eventually entered into the Nine West Settlement,[14] paying $120 million to Nine West's estate in exchange for dismissal of the claims.

**C. The Present Coverage Dispute and Procedural History**

To recoup a portion of the Nine West Settlement and the expenses incurred to defend it, Sycamore turned to the Insurers for reimbursement. The Insurers, however, refused coverage, thereby prompting this action. The Insurers removed the case to federal court, but the district court remanded for lack of subject matter jurisdiction, and alternatively, in abstention.

On September 6, 2019, Sycamore filed an amended complaint[17] in which it alleges the Insurers breached[18] the Policies by denying coverage for the Nine West Settlement and defense costs associated with the bankruptcy estate litigation.[19] In

---

[12] *Id.* at 25-28.
[13] *Id.* at 39-55; Amended Complaint ¶¶ 45-46 (D.I. 47) ("Compl.")
[14] Compl. ¶¶ 48-50.
[17] *See generally* Compl.
[18] Compl. ¶¶ 57-77.
[19] *Id.* Prayer for Relief. Sycamore also requests coverage declarations

6

their answers to the amended complaint, the Insurers raised a series of affirmative defenses, including the Uninsurability Defense.[20] Through that Defense, the Insurers contend the Nine West Settlement is uninsurable as a matter of public policy because it represents disgorgement of, or restitution for, the ill-gotten gains Sycamore procured from the Nine West transactions.

On September 8, 2020, Sycamore moved for partial judgment on the pleadings as to the Uninsurability Defense.[21] The parties briefed the motion, and the Court took the motion under advisement after hearing oral argument.[22]

## PARTIES' CONTENTIONS

In support of its motion, Sycamore argues the Policies' "law most favorable" provision, which expressly governs issues of uninsurability, is a choice of law clause.[23] Because that provision was negotiated to benefit the insured, Sycamore is free to select the jurisdiction most favorable to it, which Sycamore argues is Delaware.[24] Sycamore contends that under Delaware law losses are uninsurable as-

---

[20] *See* Starr Indemnity & Liability Company's Answer and Affirmative Defenses at Affirmative Defenses ¶ 31 (D.I. 63); Argonaut Insurance Company's Answer and Affirmative Defenses at Affirmative Defenses ¶¶ 9-10 (D.I. 61); Markel American Insurance Company's Answer and Affirmative Defenses at Affirmative Defenses ¶ 5 (D.I. 60); Ironshore Indemnity Inc.'s Answer and Affirmative Defenses at Affirmative Defenses ¶ 5 (D.I. 59); Great American Insurance Company's Answer and Affirmative Defenses at Affirmative Defenses ¶ 7 (D.I. 54).
[21] D.I. 126.
[22] Sycamore's Opening Brief (D.I. 127) ("Op. Br."); Insurers' Answering Brief (D.I. 134) ("Ans. Br."); Sycamore's Reply Brief (D.I. 136) ("Reply"); D.I. 143.
[23] Op. Br. at 13-14; Reply at 3-13.
[24] *Id.*

against public policy only if the legislature expressly so provides.[25] Delaware's General Assembly has not enacted any statute making restitution or disgorgement uninsurable,[26] and Sycamore therefore argues the Nine West Settlement—even if construed to represent restitution or disgorgement—is not uninsurable as a matter of Delaware law. Accordingly, Sycamore maintains, the Uninsurability Defense fails.[27]

If the Court concludes the law most favorable provision is not a choice of law clause, Sycamore alternatively argues Delaware law nevertheless applies because Delaware has the most significant relationship to the Policies because (1) Sycamore is organized in Delaware; and (2) the Policies provide D&O coverage, and Delaware has a stronger interest in resolving claims that involve fiduciary duties, like those brought by Nine West's estate, than New York does.[28] Even if New York law applies, Sycamore contends, the Policies plainly provide that Losses are not excluded as unlawful gains unless they are adjudged unlawful in a "final, non-appealable" decision, not in a settlement like the one at issue here.[29]

---

[25] Op. Br. at 16-20; Reply at 16-20.
[26] *Id.*
[27] *Id.*
[28] Op. Br. at 14-15; Reply at 13-16.
[29] Op. Br. at 20-24; Reply at 20-24.

In opposition, the Insurers argue the law most favorable provision is not a choice of law clause because it does not identify a particular state.[30] Even if it is a choice of law clause, the Insurers contend, it is unenforceable under Restatement (Second) Conflict of Laws § 187(2)(b).[31] Since New York law applies, the Insurers continue, the Nine West Settlement is uninsurable as a matter of public policy because it represents restitution or disgorgement.[32] But, even if Delaware law applied, the Insurers argue the Nine West Settlement would be uninsurable because Nine West's estate brought fraudulent transfer claims, and a Delaware statute prohibits fraudulent transfers.[33] Finally, in the Insurers' view, the Policies' unlawful gains exclusion is irrelevant because Sycamore has not met its burden to show the Nine West Settlement is covered.[34]

## STANDARD OF REVIEW

A party may move for judgment on the pleadings under Superior Court Civil Rule 12(c).[35] In deciding a motion under that rule, the Court accepts the truth of all well-pleaded facts and draws all reasonable factual inferences in favor of the non-moving party.[36] The Court "accords the party opposing a Rule 12(c) motion the

---

[30] Ans. Br. at 14-15.
[31] *Id.* at 15-23.
[32] *Id.* at 24-26.
[33] *Id.* at 26-27.
[34] *Id.* at 27-31.
[35] *See* Del. Super. Ct. Civ. R. 12(c).
[36] *See Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993); *Northrop Grumman Innovation Sys., Inc. v. Zurich Am. Ins. Co.*, 2021 WL

9

same benefits as a party defending" a motion to dismiss under Rule 12(b)(6).[37] Accordingly, this Court will grant a motion for judgment on the pleadings only if, after drawing all reasonable inferences in favor of the non-moving party, there is no material fact in dispute and the moving party is entitled to judgment as a matter of law.[38]

## ANALYSIS

There are three steps to Delaware's conflict-of-law framework,[39] which this Court applies in cases pending before it.[40] First, the Court must determine whether the parties' contract contains an effective choice of law provision.[41] If it does, the analysis ends. If no choice of law provision applies, the Court next determines whether "there is an actual conflict between the laws of the different states each party believes should apply."[42] If such a conflict exists, the Court proceeds to the last step:

---

347015, at *6 (Del. Super. Ct. Feb. 2, 2021) (citing *Indian Harbor Ins. Co. v. SharkNinja Operating LLC*, 2020 WL 6795965, at *2 (Del. Super. Ct. Nov. 19, 2020)).

[37] *Catlin Specialty Ins. Co. v. CBL & Assocs. Props., Inc.*, 2017 WL 4784432, at *6 (Del. Super. Ct. Sept. 20, 2017) (citing *Desert Equities*, 624 A.2d at 1205); *see SharkNinja*, 2020 WL 6795965, at *2 ("[T]he standard for motion for judgment on the pleadings is almost identical to the standard for a motion to dismiss under Rule 12(b)(6)." (internal quotation marks omitted)); *see also Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *1-2 (Del. Super. Ct. Nov. 1, 2017) (importing same liberal construction into review of motion for "partial" judgment on the pleadings).

[38] *V&M Aerospace LLC v. V&M Co.*, 2019 WL 3238920, at *3 (Del. Super. Ct. July 18, 2019) (citations omitted).

[39] *Pfizer Inc. v. Arch Ins. Co.*, 2019 WL 3306043, at *6 (Del. Super. Ct. July 23, 2019).

[40] *See, e.g., Shook & Fletcher Asbestos Settlement Tr. v. Safety Nat'l Cas. Corp.*, 2005 WL 2436193, at *2 (Del. Super. Ct. Sept. 29, 2005), *aff'd*, 909 A.2d 125 (Del. 2006).

[41] *Pfizer*, 2019 WL 3306043, at *6 (citing *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017)); *accord Travelers Indem. Co. v. CNH Indus. Am., LLC*, 2018 WL 3434562, at *3 (Del. July 16, 2018).

[42] *Pfizer*, 2019 WL 3306043, at *6 (citing *Chemtura*, 160 A.3d at 464).

10

use of the "'most significant relationship test' to determine which state's law applies."[43]

As explained below, the "law most favorable" provision is an enforceable choice of law clause that allows Sycamore to select (within reason) a forum for determining whether a Loss is uninsurable. Because Sycamore has chosen Delaware law (a reasonable choice), Delaware law and public policy govern whether the Nine West Settlement is uninsurable. In Delaware, public policies against insurability must be pronounced by statute, not by judicial fiat. The General Assembly, however, has not enacted a law rendering restitution or disgorgement uninsurable, and the Insurers' Uninsurability Defense therefore fails.

## A. Delaware law governs the question of whether the Nine West Settlement is uninsurable.

### 1. The "law most favorable" provision is a choice of law clause.

Delaware enables sophisticated counterparties to contract as they wish, and its courts generally leave bilaterally negotiated contract terms undisturbed.[44] Indeed, Delaware courts respect voluntary agreements "as a matter of fundamental public

---

[43] *Id.*; *but see Deuley v. DynCorp Int'l Inc.*, 8 A.3d 1156, 1161 (Del. 2010) (observing choice-of-law analyses are unnecessary when conflict is false); *but see also IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *6 (Del. Super. Ct. Jan. 31, 2019) ("Delaware courts recognize that, where possible, a court should avoid a choice-of-law analysis altogether if the result would be the same under the law of either of the competing jurisdictions." (citations omitted)).

[44] *See, e.g., Change Cap. Partners Fund I, LLC v. Volt Elec. Sys., LLC*, 2018 WL 1635006, at *4-9 (Del. Super. Ct. Apr. 3, 2018) (collecting and discussing authority).

11

policy."[45] That deference extends not only to the contents of a deal, but also to the governing law its makers choose.[46] As with other contractual provisions, ensuring the predictability of the dispute resolution provisions contracting parties select is important to preserving stable business arrangements.[47] The same principles of preserving certainty and justified expectations undergird the Second Restatement, which Delaware follows with respect to conflict of law.[48] As a result, "with very limited exceptions,"[49] Delaware courts enforce contractual choice of law clauses as long as the jurisdiction chosen has a "substantial relationship to the parties or the transaction" and the choice is not unenforceable under the fundamental public policy of a "default" and materially-more interested state.[50]

---

[45] *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009); *accord Swipe Acquisition Corp. v. Krauss*, 2021 WL 282642, at *2 (Del. Ch. Jan. 28, 2021) ("Upholding freedom of contract is a fundamental policy of this state." (internal quotation marks omitted)).

[46] *See, e.g., Swipe*, 2021 WL 282642, at *2; *Abry Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1048-50, 1059-61 (Del. Ch. 2006).

[47] *See Change Cap.*, 2018 WL 1635006, at *4 ("[Delaware] 'courts will enforce the contractual scheme that the parties have arrived at through their own self-ordering, both in recognition of a right to self-order and to promote certainty of obligations.'" (quoting *Ascension Ins. Holdings, LLC v. Underwood*, 2015 WL 356002, at *4 (Del. Ch. Jan. 28, 2015))); *see NACCO*, 997 A.2d at 35 ("Delaware law generally elevates contract law . . . to allow parties to order their affairs and bargain for specific results. . . .").

[48] *See Chemtura*, 160 A.3d at 464; *Focus Fin. Partners, LLC v. Holsopple*, 241 A.3d 784, 805 (Del. Ch. 2020) (citing *Restatement (Second) of Conflict of Laws* § 188 (1971)) (hereinafter, "*Restatement*") (observing that "justified expectations" are central to a contractual choice-of-law analysis); *Abry Partners*, 891 A.2d at 1048 ("Parties operating in interstate . . . commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship." Frustrating that choice "would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid." (citation omitted)).

[49] *Change Cap.*, 2018 WL 1635006, at *4 (internal quotation marks omitted).

[50] *Restatement* §§ 187(2)(a)-(b).

12

Under the Policies, the parties agreed "the law most favorable to . . . insurability" would apply to disputes in which the Insurers challenge a Loss as uninsurable.[51] This clause unambiguously is a choice of law clause. Because Sycamore is seeking coverage, the provision grants Sycamore discretion to choose any reasonable[52] forum it believes would maximize its chances of defeating the Uninsurability Defense. Here, Sycamore chose Delaware. In this instance, then, the "law most favorable" provision is a Delaware choice of law clause.

By statute, Delaware law presumptively is valid and a "significant, material and reasonable" choice of law.[53] The same presumption for voluntary choices is embodied in Restatement § 187.[54] Moreover, Sycamore is incorporated in Delaware, giving the state a "substantial relationship" to Sycamore.[55] Sycamore's choice therefore enjoys deference unless the Insurers make "a strong showing" that

---

[51] Policies, General Definitions § I.O(1).

[52] *See Restatement* § 187(2)(a) (requiring a "reasonable basis" for the choice); *accord Holsopple*, 241 A.3d at 803-04.

[53] 6 *Del. C.* § 2708(a); *Change Cap.*, 2018 WL 1635006, at *4 ("Title 6, section 2708(a) of the Delaware code recognizes that a choice of law clause is a significant, material and reasonable relationship with this State and shall be enforced whether or not there are other relationships with this State." (internal quotation marks omitted)); *see FdG Logistics LLC v. A&R Logistics Holdings, Inc.*, 131 A.3d 842, 855 (Del. Ch. 2016) ("At its core, Section 2708 is intended to provide certainty to parties who are subject to jurisdiction in Delaware that their choice of Delaware law regarding the construction and enforceability of their contracts will be respected."), *aff'd*, 148 A.3d 1171 (Del. 2016).

[54] *Restatement* § 187(2) ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied" unless shown that the choice is not reasonable or is unenforceable).

[55] *See Holsopple*, 241 A.3d at 804 (citing *Restatement* § 187 cmt. f); *see also Change Cap.*, 2018 WL 1635006, at *8 (observing that when an entity is chartered in Delaware, that entity's choice of Delaware law confirms a substantial relationship).

13

rejecting Sycamore's choice "would vindicate a public policy interest even stronger" than Delaware's touchstone interest in contractual enforcement.[56] In other words, Delaware law controls unless the Insurers demonstrate clearly that the law most favorable provision is unenforceable because of a public policy in a state with an interest materially greater than Delaware's.

Before arguing unenforceability, however, the Insurers fault the wording they voluntarily accepted. They contend the law most favorable provision is not a choice of law clause because it fails to specify the "law most favorable." To support their theory, they rely on two Delaware cases that, in their view, hold as much. But the quotations the Insurers offer are taken out of context, and courts have ruled against the Insurers' theory.

Citing *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa,*[57] the Insurers suggest a choice of law clause that does not name a specific jurisdiction is ineffective because it permits "forum shopping."[58] The Insurers' argument would extend *Hoechst* well beyond its narrow ruling. In *Hoechst*, the court construed a "service-of-suit" clause providing that the "law and practice" of a jurisdiction selected by the insured would resolve coverage issues. After declaring

---

[56] *Change Cap.*, 2018 WL 1635006, at *4 (internal quotation marks omitted).
[57] 1994 WL 721651 (Del. Super. Ct. Mar. 28, 1994).
[58] Ans. Br. at 14-15.

the provision ambiguous,[59] the court held that it referred to procedural, rather than substantive, law.[60] The court did not conclude that an insurance provision empowering the insured to choose advantageous substantive law categorically is invalid. To the contrary, the court noted that it would have read the phrase "law and practice" to capture both procedural and substantive law if its drafters had chosen more precise wording.[61]

The Insurers' reliance on *Certain Underwriters at Lloyds, London v. Chemtura Corp.*[62] similarly is misplaced. According to the Insurers, the Supreme Court in *Chemtura* rejected the insured's choice of law "because the insurance policies did not specify a particular state law."[63] But the *Chemtura* policies did not contain a choice of law provision, and the Supreme Court merely acknowledged that fact at the beginning of its review.[64] Indeed, the Supreme Court reversed the lower

---

[59] *Hoechst*, 1994 WL 721651, at \*1. Unlike that clause, however, the law most favorable provision is unambiguous. *Hoechst*, then, is doubly inapposite.

[60] *Id.* ("[T]he phrase refers to the entire law of the forum, including the forum's choice of law principles."). The court also approached the issue at a time when Delaware courts "recently held that a [service-of-suit] clause is not a choice of law provision." *Id.* at \*2.

[61] *Id.* at \*1 ("If the drafters . . . had intended the local law of the forum chosen by the insured to apply . . . they would have included the terms 'local law' or 'substantive law' in the . . . clause."). Contrary to the Insurers' position, the court's reference to "forum shopping" came only after it held the provision did not cover substantive law. *See id.* ("*To hold otherwise*, [*i.e.*, that the insured had a right not provided in the agreement], would allow . . . forum shopping." (emphasis added)). Here, in contrast, the law most favorable provision plainly means "substantive law most favorable." *See* Policies, General Definitions § I.O(1) (providing that the law most favorable should determine any uninsurable exceptions to the Loss definition).

[62] 160 A.3d 457.

[63] Ans. Br. at 15 (emphasis omitted).

[64] *See Chemtura*, 160 A.3d at 464 ("The Superior Court correctly observed that the insurance policies did not specify a particular state law." (citation omitted)).

15

court on most significant relationship grounds—not on effective choice of law grounds—because there was no choice of law provision at issue in the case.[65]

With those decisions considered in their proper context, the Insurers are left without any case in which a court disregarded a choice of law clause for lack of jurisdictional specificity. And they also have not meaningfully distinguished rulings from courts outside Delaware construing "law most favorable" provisions as choice of law clauses. For example, in *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*,[66] the Supreme Court of New Jersey found that an insurance clause that endorsed "the law of the jurisdiction most favorable to insurability" self-evidently was a choice of law provision.[67] Similarly, in *Walters v. Am. Home Assurance*,[68] the New Jersey federal district court recognized that insurance counterparties may "implicitly . . . incorporate[] a choice of law provision" into their agreements by negotiating a "law . . . most favorable to insurability" term.[69]

In sum, the Insurers cannot explain what the law most favorable provision *is* if it is *not* a substantive choice of law clause. They next argue the provision is unenforceable under Restatement Section 187.

---

[65] *See id.* at 464-69.
[66] 948 A.2d 1285 (N.J. 2008).
[67] *Id.* at 1289, 1293.
[68] 2011 WL 4409170 (D.N.J. Sept. 21, 2011).
[69] *Id.* at *5 (internal quotation marks and citations omitted).

16

## 2. The law most favorable provision is enforceable.

Under Delaware law, when contracting parties identify a state's laws to govern the contract, a party seeking to invalidate that choice bears the burden of showing why a different state's laws should apply.[70] In doing so, that party must establish three elements under Restatement § 187(2)(b): (1) the different state would be the "default" state but for the choice of law provision; (2) enforcement of the agreement would be contrary to a fundamental public policy of that different state; and (3) that different state has a materially greater interest than Delaware in the enforcement or non-enforcement of the agreement.

But refuge in Restatement § 187(2)(b) is reserved for rare cases. The exception "does not exist as a sword for parties to avoid their contracts when avoidance suits their personal interests."[71] Indeed, "Delaware courts will not easily invalidate"[72] a choice of law provision, and seller's remorse is not a commercially reasonable basis for avoiding a choice of law clause.[73] Instead, opponents may seek

---

[70] *Change Cap.*, 2018 WL 1635006, at *6 (citing *Ascension*, 2015 WL 356002, at *3); *accord Wind Point Partners VII-A, L.P. v. Insight Equity A.P. X Co., LLC*, 2020 WL 5054791, at *19 (Del. Super. Ct. Aug. 17, 2020).

[71] *Change Cap.*, 2018 WL 1635006, at *9 (citing *Libeau v. Fox*, 880 A.2d 1049, 1058 (Del. Ch. 2005)) (internal quotation marks omitted), *rev'd on other grounds*, 892 A.2d 1068 (Del. 2006).

[72] *Change Cap.*, 2018 WL 1635006, at *8 (internal quotation marks omitted).

[73] *See Abry Partners*, 891 A.2d at 1049-50; *accord Lyons Ins. Agency Inc., v. Wark*, 2020 WL 429114, at *1 (Del. Ch. Jan. 28, 2020) ("Delaware law in general recognizes that the value of contracts is maximized by enforcing them as written [and that] little value can come of a promise that can be avoided upon the remorse of the maker thereof.").

[74] *Change Cap.*, 2018 WL 1635006, at *9 (citing *Libeau*, 880 A.2d at 1058) (internal quotation marks omitted).

17

relief under Restatement § 187(2)(b) only when enforcement of a Delaware choice of law provision clearly would nullify a default state's unique public interests.[74] The Insurers advance several reasons why this is the type of rare case for which Section 187(2)(b) was intended. None of those reasons is persuasive.

### a. New York would not be the "default" state.

The Insurers contend that, but for the Policies' law most favorable provision, New York would be the default state because: (1) Sycamore is headquartered in New York; (2) the Nine West transactions occurred in New York; (3) the alleged misconduct that Nine West's estate litigated occurred in New York; (4) the Policies were issued and brokered in New York; and (5) the Policies contain New York endorsements.[75]

What the Insurers omit, however, is that the Policies are fiduciary liability insurance contracts written to cover Delaware entities for claims concerning the entities' management and internal affairs. This Court repeatedly has held that Delaware takes a superseding interest in the merits of disputes involving insurance coverage for fiduciary mismanagement of Delaware organizations.[76] In so ruling,

---

[75] *See* Ans. Br. at 15-17; *Restatement* § 187(2)(b) (directing courts to consider § 188 factors in determining which state's laws would apply absent an effective choice of law provision).

[76] *See, e.g., Northrop*, 2021 WL 347015, at *16-17; *Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*, 2020 WL 363677, at *4 & n.42 (Del. Super. Ct. Jan. 21, 2020), *appeal refused sub nom., Beazley Ins. Co. Inc. v. Ferrellgas Partners L.P.*, 249 A.3d 408 (Del. 2020); *Pfizer*, 2019 WL 3306043, at *8; *IDT Corp.*, 2019 WL 413692, at *6-7; *Arch Ins. Co. v. Murdock*, 2018 WL

18

this Court has deemed the state of incorporation—for Sycamore, Delaware—the default state despite the same factual circumstances the Insurers marshal here in favor of applying New York law.[77] For example, this Court in *Pfizer Inc. v. Arch Ins. Co.* held Delaware law governed a D&O policy issued to a Delaware-incorporated firm despite the fact that the firm was headquartered in New York, the policies were issued and brokered in New York, the policies were amended by New York endorsements, and the underlying claim to which coverage attached was filed in New York.[78] Similarly, even if some of the Restatement factors favor New York in this case, the presence of a D&O insurance agreement benefitting Delaware insureds balances the remaining factors in Delaware's favor.[79] Accordingly, Delaware, not New York, would be the default state if the Policies did not contain the law most favorable provision.[80]

1129110, at *10-11 (Del. Super. Ct. Mar. 1, 2018); *Mills Ltd. P'ship v. Liberty Mut. Ins. Co.*, 2010 WL 8250837, at *5-6 (Del. Super. Ct. Nov. 5, 2010).

[77] *Pfizer*, 2019 WL 3306043, at *7-8; *see Murdock*, 2018 WL 1129110, at *10-11 (state of incorporation is the default state in D&O insurance context); *see also Mills*, 2010 WL 8250837, at *6 ("In a case [where a Delaware firm purchases D&O policies for the benefit of its managers,] what difference does headquarters' location make to the company or people involved?").

[78] *See Pfizer*, 2019 WL 3306043, at *7-8.

[79] *Cf. id.* at *6-8 (evaluating *Restatement* § 188 factors in the absence of a choice of law provision and concluding the presence of a D&O insurance policy and the insured's Delaware incorporation status diminished New York's—but strengthened Delaware's—contacts to the litigation).

[80] *See Northrop*, 2021 WL 347015, at *16-17; *IDT Corp.*, 2019 WL 413692, at *6-7; *Murdock*, 2018 WL 1129110, at *10-11; *Mills*, 2010 WL 8250837, at *6. For this reason, even if the law most favorable provision were not a choice of law clause, Delaware law would have the most significant relationship to the policies. *See Northrop*, 2021 WL 347015, at *16-17; *Pfizer*, 2019 WL 3306043, at *6-8.

Undeterred, the Insurers seek to downplay Delaware's connection to the Policies by emphasizing that (i) the Policies provide both D&O *and* E&O coverage, and (ii) Nine West estate's claims asserted E&O-based wrongdoing.[81] But that effort overlooks two key points. First, Nine West's estate brought breach of fiduciary duty claims as well as claims under the E&O coverage.[82] In the Insurers' words, Sycamore profited from "classic self-dealing."[83] That contention challenges Sycamore's managers' loyalty—the very type of exposure D&O insurance covers.[84] Second, even after crediting the Insurers' E&O-only reading of the Nine West litigation, New York still would not be the default state. Delaware courts engaged in a conflict-of-law analysis do not focus on the specific claims asserted in the underlying litigation, but rather concentrate on the insurance scheme as a whole.[85] As a result, Delaware nevertheless would be the default state because the Policies were issued to Sycamore, a Delaware-organized group, to indemnify wrongdoing

---

[81] Ans. Br. at 18-19.

[82] NW Plan at 39-55.

[83] Ans. Br. at 8.

[84] *Murdock*, 2018 WL 1129110, at *9 (observing that D&O insurance is implicated whenever "the directors' and officers' 'honesty and fidelity'" to a Delaware corporation has been challenged (quoting *Mills*, 2010 WL 8250837, at *6)); *accord Northrop*, 2021 WL 347015, at *16 ("[P]redictability for and the justified expectations of Delaware firms are vindicated when their state of incorporation resolves questions about the 'honesty and fidelity' of their Delaware officials[.]" (citations omitted)); *IDT Corp.*, 2019 WL 413692, at *6; *see* 8 *Del. C.* § 145 (enabling Delaware entities to purchase insurance for their fiduciaries and making indemnification mandatory in certain cases).

[85] *See Pfizer*, 2019 WL 3306043, at *8 ("[W]hen applying the . . . *Restatement* to a corporate-wide insurance program, 'the inquiry should center on the insurance contracts and not the underlying claims.'" (quoting *CNH Indus.*, 2018 WL 3434562, at *1)).

engaged by its Delaware managers. The particular misconduct Nine West identified, the theories of relief it alleged, the litigation forum in which it sued, and Sycamore's New York headquarters are not pertinent to the analysis, or at minimum, fail to outweigh Delaware's interest.[86]

Failure to satisfy the default-state element is enough to end the analysis under Restatement § 187(2)(b).[87] Nonetheless, for the sake of completeness and eventual judicial review, I briefly will address the Restatement's remaining elements.

### b. The Insurers fail to satisfy the other Section 187(2)(b) elements.

In blending New York's putative public policies and material contacts, the Insurers shepherd an array of New York cases disapproving fraudulent transfers and declaring restitution or disgorgement uninsurable.[88] Although those decisions may illustrate a general common law discouragement of dubious gains, they do not establish New York's overriding enforcement priorities in these Policies.

There is no bright-line rule for measuring the weight of a sister state's policies and interests.[89] But caselaw offers some guidance. A materially greater interest

---

[86] *See Northrop*, 2021 WL 347015, at *17; *see also Pfizer*, 2019 WL 3306043, at *8 ("Where D&O coverage is at issue 'and the choice of law is between the headquarters and state of incorporation, the state of incorporation has the most significant relationship.'" (quoting *Murdock*, 2018 WL 1129110, at *9)).

[87] *See, e.g., Wind Point*, 2020 WL 5054791, at *19 (Party must demonstrate clearly default state, fundamental public policy, and materially greater interest elements "in order to invoke the [*Restatement*] § 187(2)(b) exception." (citation omitted)).

[88] Ans. Br. at 19-26.

[89] *See, e.g., Holsopple*, 241 A.3d at 820 ("Whether a policy is 'fundamental' involves a case-specific analysis." (citing *Restatement* § 187 cmt. g)); *cf. Restatement* § 188(2) (listing factors for

21

surely lies when enforcement would threaten a fundamental public policy more vital than the freedom of contract.[90] And on that point, "[a] mere difference between the laws of two states" will not make enforcement "in one state contrary to the public policy of another."[91] In line with this reasoning, Delaware courts eschew recognition of "generalized" interests.[92] Conversely, and consistent with Restatement § 187, Delaware courts often treat a public policy as "fundamental" and an interest as "materially greater" where the alternate forum clearly articulates its judgments and concerns by statute.[93] Still, the existence of a foreign statute, although significant, is not always dispositive.[94] At minimum, then, the alternate forum—especially when not the default state—must strongly and with precision disfavor the outcome likely to be derived from Delaware law on "the particular issue" for that forum's putative policies and interests to be categorized as "fundamental" and "materially greater."[95]

---

determining the default state but not for determining whether a policy is fundamental, or an interest is materially greater under § 187(2)(b)).

[90] *See Change Cap.*, 2018 WL 1635006, at *4, *9; *see also Geo-Tech. Assocs., Inc. v. Cap. Station Dover, LLC*, 2020 WL 2557139, at *3 (Del. Super. Ct. May 15, 2020) ("[Delaware] courts will not interfere unless . . . a public policy interest [is] even stronger than the freedom of contract." (internal quotation marks omitted)).

[91] *Change Cap.*, 2018 WL 1635006, at *5 (citing *J.S. Alberici Constr. Co., Inc., v. Mid-W. Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000)) (internal quotation marks omitted).

[92] *See Holsopple*, 241 A.3d at 812, 821; *Ascension*, 2015 WL 356002, at *5.

[93] *See Holsopple*, 241 A.3d at 820 (citing *Restatement* § 187 cmt. g); *Swipe*, 2021 WL 282642, at *3-7 (finding California materially more interested where a California statute prohibited contractual waivers of rights afforded investors); *Wind Point*, 2020 WL 5054791, at *19-20 (finding Texas materially more interested where a Texas statute prohibited contractual waivers of rights afforded investors); *Ascension*, 2015 WL 356002, at *2 (finding California materially more interested where California statute invalidated the specific non-compete provision at issue).

[94] *See Change Cap.*, 2018 WL 1635006, at *7 (applying Delaware law although the outcome would have been usurious under a Texas statute).

[95] *Restatement* § 187(2)(b).

22

The Insurers cite two decisions oriented by these principles in which another state's enforcement priorities supplanted a Delaware choice of law provision. Those decisions, however, are distinguishable and, in fact, undercut the Insurers' position.

In *Wind Point Partners VII-A, L.P. v. Insight Equity A.P. X Co., LLC*,[96] this Court construed a Delaware choice of law provision in a stock purchase agreement that would have stripped Texas investors of a right to sue afforded them by a Texas securities statute.[97] Importantly, the statute specifically invalidated contractual choice of law provisions that would have the effect of waiving specific, Texas-conferred remedies for fraudulently secured investments.[98] Given that Texas—the default state—had a reticulated regulatory scheme to reach Texas investors wherever harmed, this Court refused to replace it with a parallel but generalized Delaware securities law that limited recovery for harm inflicted inside Delaware only.[99] As the Court acknowledged, Delaware law is unlikely to apply where its application "would lead to [the] absurd result[]" of impairing a class specifically identified by a foreign statute for protection.[100]

---

[96] 2020 WL 5054791.

[97] *Id.* at *18-21.

[98] *Id.* at *19-20 (quoting statutory language and characterizing it as a "fundamental policy").

[99] *Id.*

[100] *Id.* at *20. The Court of Chancery, following *Wind Point*, recently reached the same conclusion. In *Swipe Acquisition Corp. v. Krauss*, the same Delaware securities statute at issue in *Wind Point* was pitted against a California securities statute that invalidated any choice of law provision that effectively would eliminate California investors' statutory rights. As a result, the Court declined to enforce the Delaware choice of law provision at issue, which would have worked a waiver of the very type California specifically disapproved. *See Swipe*, 2021 WL 282642, at *5-7.

23

Similarly, in *Ascension Ins. Holdings, LLC v. Underwood*,[101] the Court of Chancery confronted an equity-based compensation plan offered to a California employee by a California-based firm. The plan contained both a non-compete provision and a Delaware choice of law provision.[102] The non-compete provision, however, would have been unenforceable by California statute.[103] After determining that California was the default state, the Court of Chancery held that a covenant made illegal "unequivocally by statute" could not be enforced in Delaware, which merely had a generalized policy and interest in comparison.[104] Central to that analysis was the rationale that parties cannot "contract[] around the law of *a default state* . . . unless the second state also has a compelling interest in enforcement" beyond its pro-contractarian regime.[105]

*Wind Point* and *Ascension* reflect three guiding principles about invoking Restatement § 187(2)(b) successfully. *First*, a court will accord considerable weight to a sister state's competing position that is codified by statute.[106] Here, New York has not enacted a statute prohibiting insurance of restitution or disgorgement.

---

[101] 2015 WL 356002.
[102] *Id.* at *1-2.
[103] *Id.* at *2-3.
[104] *Id.* at *5.
[105] *Id.* (emphasis added).
[106] *See Wind Point*, 2020 WL 5054791, at *19 (citing the Texas securities statute and Texas caselaw interpreting it in concluding Texas's investor-protection policy was fundamental); *Ascension*, 2015 WL 356002, at *2 (finding it critical that California employment policy was "not a common-law" development but was "enshrined in statute").

24

*Second,* and by the same token, a sister state's stance should reflect a focused initiative—not a generalized objection.[107] Here, New York's indiscriminate common law refusal to reward restitution and disgorgement reflects a generalized objection, rather than a focused initiative.[108] *Third,* if Delaware would *not* be the default state, then its enforcement priorities should not be premised entirely on freedom of contract.[109] Here, Delaware is the default state. Even if it was not, Sycamore is a Delaware-organized group of investment funds facing recoupment claims for wrongdoing attributable to Delaware fiduciaries under corporate-wide management liability insurance policies that permit Sycamore to select Delaware's courts for hearing its coverage disputes. This Court's D&O jurisprudence aside,

---

[107] *See Wind Point,* 2020 WL 5054791, at *19-20 (contrasting negatively Delaware's general disdain for securities fraud with Texas's specialized statutory interest in "protect[ing] Texas residents" from illegal "interstate securities transactions" "emanating from Texas" (internal quotation marks and citations omitted)); *Ascension,* 2015 WL 356002, at *5 ("The performance of a covenant not to compete is against a clear public policy of California stated unequivocally by statute. Against this is a general [though, to the Court, "significant"] interest of Delaware in freedom of contract.").

[108] *Cf. Wind Point,* 2020 WL 5054791, at *19-20 (reviewing focused anti-contractual waiver statute); *Ascension,* 2015 WL 356002, at *2-5 (reviewing focused anti-non-compete statute); *Change Cap.,* 2018 WL 1635006, at *5 ("A mere difference between the laws of two states will not necessarily render the enforcement of a cause of action arising in one state contrary to the public policy of another." (citing *J.S. Alberici,* 750 A.2d at 520) (internal quotation marks omitted)).

[109] *See Wind Point,* 2020 WL 5054791, at *18-19 (citing Delaware's pro-contractarian interests but nevertheless finding Texas's clear statutory prohibition on remedial waivers to be more fundamental); *Ascension,* 2015 WL 356002, at *5 (When the "formation and enforcement of the contract relate overwhelmingly *to the default state,* a general interest in the freedom of contract is unlikely to be the equal of that public policy. . . ." (emphasis added)) *see also Wind Point,* 2020 WL 5054791, at *19 (holding Texas was the default state before diminishing weight of Delaware's pro-contractarian interests); *Ascension,* 2015 WL 356002, at *3 (holding California was the default state before diminishing weight of Delaware's pro-contractarian interests).

those contacts indicate more than a generalized Delaware interest in the Policies. And, Delaware law, not New York law, would determine whether Sycamore's managers breached a fiduciary duty or are entitled to indemnification for a derivative suit.[110] Delaware's interests in those particular issues are fundamental and enshrined by statute.[111] As a result, Delaware here is concerned with more than simply the freedom of contract.[112] This being so, New York's interest in preventing a Delaware enterprise from obtaining insurance in its chartering jurisdiction for misconduct by its fiduciaries is (at best) tangential.[113]

Accordingly, because the Insurers fail to satisfy all elements, the Restatement § 187(2)(b) exception is unavailable, the law most favorable provision is enforceable, and Delaware law applies in determining whether the Nine West Settlement is uninsurable.

---

[110] *See IDT Corp.*, 2019 WL 413692, at *6-7 ("Delaware law ultimately determines whether a director or officer of a Delaware corporation breaches his or her fiduciary duties." (internal quotation marks and citations omitted)); *Murdock*, 2018 WL 1129110, at *11 (same).

[111] *See* 8 *Del. C.* § 144(a) (enumerating standards of review for self-dealing claims); 8 *Del. C.* § 145(g) (authorizing corporations to purchase insurance for fiduciaries "against any liability asserted . . . in any . . . capacity, or . . . status . . . whether or not the corporation would have the power to indemnify" the fiduciary otherwise); *see also Murdock*, 2018 WL 1129110, at *11 (citing 8 *Del. C.* § 145(g)); *Mills*, 2010 WL 8250837, at *6 (citing 8 *Del. C.* § 145(g)).

[112] *Cf. Ascension*, 2015 WL 356002, at *5 (finding no non-contractarian Delaware interest).

[113] *See Mills*, 2010 WL 8250837, at *6 (observing that a sister state's interest "in whether Delaware corporations insure their directors and officers" is "indirect" and not overriding).

26

## B. Under Delaware law, the Nine West Settlement is insurable.

"A court may not enforce an insurance provision that is contrary to public policy."[114] But in Delaware, losses are uninsurable as-against public policy only if the legislature so provides.[115] As the Supreme Court has cautioned, public policy is the General Assembly's domain, and judges should avoid the temptation to legislate from the bench.[116] Following these instructions, this Court has declined invitations to apply judicially-fashioned policy limitations.[117] Consistent with that precedent, the Court will not hold that restitution or disgorgement is uninsurable as a matter of Delaware public policy unless a Delaware statute commands it to do so.[118]

There is no such Delaware statute. Recognizing this, the Insurers resort to relying on Delaware's anti-fraudulent conveyance statute,[119] from which they urge

---

[114] *Murdock*, 2018 WL 1129110, at *11 (citation omitted).

[115] *See Jones v. State Farm Mut. Auto. Ins. Co.*, 610 A.2d 1352, 1354 (Del. 1992); *Whalen v. On-Deck, Inc.*, 514 A.2d 1072, 1074 (Del. 1986).

[116] *See Jones*, 610 A.2d at 1354 (noting that "the General Assembly is the proper forum to seek a change" if insurance covers unsavory acts not excluded bilaterally (citation omitted)); *Whalen*, 514 A.2d at 1074 (holding punitive damages were not uninsurable because the legislature did not "formulate[]" a "public policy . . . against such insurance").

[117] *See, e.g., Murdock*, 2018 WL 1129110, at *11 (holding fraud damages were not uninsurable in the absence of legislation rendering them uninsurable); *Wilson v. Chem-Solv, Inc.*, 1988 WL 109375, at *1 (Del. Super. Ct. Oct. 14, 1988) (holding environmental pollution damages were not uninsurable in the absence of legislation rendering them uninsurable).

[118] Because the Insurers are entitled to favorable inferences, the Court assumes for purposes of this review that the Nine West Settlement constitutes restitution or disgorgement. *See, e.g., CBL & Assocs.*, 2017 WL 4784432, at *6 (affording party opposing 12(c) motion the same benefits afforded parties opposing 12(b)(6) motions).

[119] *See, e.g.*, 6 *Del. C.* § 1304.

27

the Court to infer the General Assembly's intent to make restitution or disgorgement uninsurable. That argument fails.

As an initial matter, the Court cannot infer a public policy against certain insurance from a statute of general applicability. Indeed, the Court "will not void . . . a valid insurance contract as contrary to public policy in the absence of *clear indicia* that such a policy actually exists."[120] There is a practical reason for this constraint. If courts understood every statute prohibiting conduct also to preclude insurance for any remedies associated with that conduct, there would be little or nothing left to insure.

More importantly, all the anti-fraudulent conveyance statute proves is that fraudulent conveyances are unlawful in Delaware.[121] Its enactment does not render *insuring* against clawback claims for which restitution or disgorgement might be exacted contrary to Delaware public policy.[122] Indeed, there are numerous Delaware statutory and common laws the breaching of which could offer relief akin to restitution or disgorgement. Those laws, however, do not automatically make insurance for that relief contrary to public policy. Delaware has a strong public

---

[120] *Whalen*, 514 A.2d at 1074 (emphasis added).

[121] *See* 6 *Del. C.* §§ 1307(a)-(b) (outlining creditor remedies for fraudulent transfers).

[122] *See Wilson*, 1988 WL 109375, at *1 (Delaware's anti-pollution statutes "impose[] civil penalties with regard to hazardous waste disposal. [They] do not prohibit insurance coverage for [those] civil penalties." (citing 7 *Del. C.* §§ 6309(b), 6005(b)).

policy against fraud,[123] but nevertheless permits insurance against fraud claims.[124] Similarly, polluting the environment is against Delaware public policy,[125] but insuring cleanup costs is not.[126] And criminal behavior is against Delaware public policy,[127] but insuring a defense of corporate fiduciaries charged with criminal conduct is not.[128] In Delaware—unless the General Assembly directs otherwise—permitting insurance of payments made to redress wrongdoing is not the same as condoning as a policy matter the wrongdoing those payments redress.[129]

To be sure, insurance companies are not required to cover restitution or disgorgement. This opinion does not suggest otherwise. Insurance companies are free to sell insurance that expressly excludes coverage for cases in which restitution or disgorgement damages or settlements are obtained. In fact, that is what the Insurers tried to do in these Policies,[130] but they cabined the exclusion to cases in

---

[123] *See, e.g., Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *11 & n.142 (Del. Super. Ct. Jan. 13, 2021) (collecting cases in which Delaware courts have refused to enforce contracts immunizing intentional fraud).

[124] *See Murdock*, 2018 WL 1129110, at *11.

[125] *See* 7 *Del. C.* §§ 6309(b), 6005(b) (providing strict liability for environmental torts).

[126] *See Wilson*, 1988 WL 109375, at *1.

[127] *See generally* 11 *Del. C.* §§ 101 *et seq.*

[128] *See, e.g.*, 8 *Del. C.* § 145(a) (authorizing Delaware corporations to indemnify fiduciaries who are convicted of a crime as long as the fiduciary "had no reasonable cause to believe [the] conduct was unlawful"); *see also Hermelin v. K-V Pharm. Co.*, 54 A.3d 1093, 1108 (Del. Ch. 2012) (explaining that a corporation is required to indemnify a fiduciary's defense fees when the fiduciary obtains "anything less than a conviction" (citing 8 *Del. C.* § 145(c)).

[129] *See Murdock*, 2018 WL 1129110, at *12 ("Although it may strain public policy [against fraud] to allow a [tortfeasor] to collect insurance on a fraud, it does not appear to [be] explicitly prohibited by Delaware statutory law.").

[130] Policies, Exclusions, § IV.A(1)(b) (excluding coverage for unlawful gains).

which a claimant obtained a "final, non-appealable" decision in the underlying litigation establishing that Sycamore gained personal profit or remuneration to which it was not entitled.[131] Faced with their own contractual limitation, the Insurers challenge Sycamore's Loss—indisputably a "settlement"[132]—as "uninsurable," not as a Policies-excluded unlawful gain. The Nine West Settlement, however, is insurable under Delaware law, and the Insurers' Uninsurability Defense therefore fails as a matter of Delaware law.[133]

## CONCLUSION

For the foregoing reasons, Sycamore's motion for partial judgment on the pleadings is **GRANTED**, and judgment is entered against the Insurers only as to the Uninsurability Defense.

**IT IS SO ORDERED.**

---

[131] *Id.* § IV.A(1).

[132] *See* Ans. Br. at 10 (conceding that Sycamore "settled for $120 million"); Policies, General Definitions § I.O (defining "Loss" to include "settlements" and carving out "amounts" that are "uninsurable under the law most favorable to . . . insurability"); Compl. ¶¶ 48-50; *see also Desert Equities*, 624 A.2d at 1205 (Court treats "well-pleaded facts alleged in the complaint as admitted" on Rule 12(c) review).

[133] Because the Court has concluded that the Nine West Settlement is insurable under Delaware law, it is unnecessary to address Sycamore's argument that the Policies would not exclude the Nine West Settlement's coverage even if Delaware law prohibited the Settlement's coverage.